STATE OF TEXAS                        §
                                     §
COUNTY OF HARRIS                     §

### AFFIDAVIT OF KIMBERLY WEBB

KIMBERLY WEBB, under penalty of perjury, made the following declaration:

"My name is KIMBERLY WEBB. I am over 18 years of age, of sound mind, and fully competent to make this affidavit. The facts as stated herein are within my personal knowledge.

"On February 25, 2019, I sent an email to Mr. Dupree indicating the various witnesses that I believed should be deposed. Mr. Dupree indicated that the witnesses would be deposed, tentatively, on March 26, 2019. [EXHIBIT 22-1]

"On March 18, 2019, I emailed my primary attorney at the Kennard Law Firm, Ronald Dupree, about the status of the witnesses, which I believed were going to be deposed. [EXHIBIT 22-2] Mr. Dupree did not return my email, but did call me. Mr. Dupree indicated that he had left that Kennard Law Firm for personal reasons, but that made suggestions on who should take over the case. Mr. Dupree did not indicate to me who he had suggested.

Afterwards, I called the Kennard Law Firm several times, and eventually received a return phone call from another attorney, Connica Lemond, on or about the week of April, 2019. Ms. Lemond indicated that she had communicated with Mr. Dupree and would develop a "game plan."

On May 16, 2019, I received an email from Amanda Hernandez, the Chief Financial Officer for the Kennard Law Firm, requesting payment of fees relating to my case. In that email, Ms. Hernandez indicated that: "If we do not receive a payment for your remaining balance, we will be forced to suspend all legal work in your case." [EXHIBIT 22-3] I responded back on May 16, 2019 by indicating the following:

> *I must say an e-mail forcing any suspension is disheartening. It has been two years since retaining the firm and we have seen no real progress. Twice we have asked to speak to Mr. Kennard himself and have not had a return call. **I feel like I am left in the dark on the case because I know absolutely nothing on where the case stands.** We have paid over $30,000.00 to the firm and try our best to be professional and reasonable clients.*

[EXHIBIT 22-4] In response, Ms. Henandez indicated that she would communicate with Mr. Kennard and Ms. Lemond. On May 16, 2019, I did receive a further email from Ms. Lemond indicating the following:

```
EXHIBIT
22
```

*I am working on your case still, but there is an issue that has come up. The other side wants us to pay for the appearance of the expert up front – that would be about $1,500.00. The expert has opined that your actions amounted to both untruthfulness and insubordination and would have led the chief to terminate your employment with the City. We believe that the there is an issue with the chief issuing you an order to submit to the polygraph immediately, but it is unclear if this expert can opine on this issue. If we proceed with the matter, it would require the prepayment of the expert. Are you okay with this?*

[EXHIBIT 22-5] Shortly thereafter, I had a follow-up phone call with Ms. Lemond, and she reiterated the need for payment. Payment for the expert was made on May 16, 2019 in the amount of $2,000.00, as Ms. Lemond indicated there were additional fees in the amount of $500 that needed to be paid in addition for the $1,500.00 for the expert witness.

I emailed Ms. Lemond again June 23, 2019, and Ms. Lemoned's email responded with an automatic notice indicating that June 14, 2019 was her last date. [EXHIBIT 22-6] Ms. Lemond's email indicated that I needed to contact June Augustine.

On June 27, 2019, I emailed June Augustine, I indicated the following:

*I am a little concerned and extremely baffled at this point. I had to find our Connica left the firm by sending her an e-mail. I received an impersonal automated response.* ***No one at the firm has reached out to me to let me know and quite frankly I am worried, this is now the second attorney to leave within a matter of months. What is going on with my case?***

***Please help me!!!***

[EXHIBIT 22-7]  Ms. Augustine indicated that she would talk to Mr. Kennard. After several other emails asking for additional information, I did receive notice that Mr. Kennard would be notified, but did not receive any response from Mr. Kennard.

On July 18, 2019, I received a request from Maria Maa that Mr. Kennard was taking over this case and that he needed an explanation regarding the most important pieces of evidence. I sent a responsive email to Mr. Kennard on July 17, 2019 outlining the evidence that I believe was important to be discussed.   [EXHIBIT 22-8]  The email dated July 17, 2019 contains a word document which outlined all of the facts in this case. [Id.]  I also sent an email to Ms. Maa on July 18, 2019. [Id.]

Shortly before my case was dismissed, I talked to the third attorney who was brought in on my case – Kevin Kennedy.  In response to a question regarding the deposition of witness, Mr. Kennedy indicated that he wanted to focus on live witness.

Based upon these facts, and in review of the City's response to my motion for new trial, I learned the following:

1. That the deadline to conduct discovery had closed on or about May 17, 2019 [Reply, page 6], which would have cut off the deadline to depose the six fact witnesses. The later admission by Mr. Kennedy about having live witnesses appears to be have been fabricated.

2. That the reason for the payment of the expert fees was needed because Kennard had waited until after expiration of the discovery deadline to depose the expert.

3. The depositions for the expert witness had never taken place, despite the fact that I had paid $1,500.00 for the expert witness was requested to be paid by Ms. Lemond on May 16, 2019.

4. The July 18, 2019 email to Ms. Maa was needed in order to flesh out the evidence to be used in support of a response to the City's motion for summary judgment filed on July 20, 2019.

5. After reviewing the case file with my current attorney, Mr. Poerschke, I learned that none of the evidence that I submitted in this case to Mr. Kennard, on July 18, 2019 or before, was included in the Court's record.

6. I never received a copy of the final judgment in this case, until I reviewed it with Mr. Poerschke.

Each exhibit attached to this affidavit is a screenshot from my cell phone from my personal Gmail account that I utilized to communicate with Kennard. The email appears exactly has how I see it on my cell phone. The screenshot duplicates exactly the email has it appears on my cell phone. After taking the screenshot, I sent the screenshots to my attorney to compile the exhibits.

On January 29, 2020, received a copy of a correspondence from Will Durham, Criminal District Attorney for Walker County, Texas. I received the correspondence in the mail. The correspondence attached to this affidavit is a true and exact copy of the correspondence received from on January 29, 2020. [EXHIBIT 22-9]

My name is KIMBERLY WEBB, my date of birth is April 15, 1989, and my address is 5111 Center St, Houston, Texas 77007, United States. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, State of Texas, on February 10, 2020.

Declarant

4:17 •••ıll 5G E 🔋

🔒 mail.google.com

'ronald...

**Kimberly Webb** ↩
to Ronald
Feb 21, 2019  Details

Are we just calling individuals harassed by Scott? Or can we call individuals that witnessesd assault(s)/harassment?

• • •

**Ronald Dupree** ↩
to me
Feb 21, 2019  Details

Witnesses (with first-hand knowledge) to his assault on you.  Yes.

Witnesses (with first-hand knowledge) to his harassment of other female officers.  Yes

Ronald Dupree

Senior Counsel

EXHIBIT
22-1

4:17

5G E

'ronald...

**Kimberly Webb**

to Ronald

Feb 21, 2019  Details

Broderick Davis - heard an assault that Eric did. Recalls me saying stop, that hurts.

Norman Jeff Dugas - witnessed assault and laughed about it

Judy Phillips - witnessed assault

Claire Wilson - witnessed assault

Yoselin Rameeiz - witnessed assault

David Collins - first hand knowledge of assault

Jose Valles - first hand knowledge of assault

Daryle Slaven - first hand knowledge of assault

Jim Barnes - first hand knowledge of assault

David O'Rear - first hand knowledge of assault

John French - first hand of knowledge

4:17   ....II 5G E

AA   🔒 mail.google.com   ↻

'ronald...

Daryle Slaven - first hand knowledge of assault

Jim Barnes - first hand knowledge of assault

David O'Rear - first hand knowledge of assault

John French - first hand of knowledge

Jeremy King- first hand knowledge of assault

Mark Jenkins - Witnessed Scott text inappropriately. he also witnessed the bending over the car but Scott wasn't the one to do that

• • •

**R**   **Ronald Dupree**
Kim, We need to use our allotted time for depositions carefully. I don't think the judge is going to permit this

**K**   **Kimberly Webb**
Claire Wilson, Judy Phillips, and Yoselin were all present for the leg sweep. Please add them. Yoselin

**K**   **Kimberly Webb**   ↩
to Ronald
Feb 25, 2019   Details

4:17

.ıll 5G E

AA  🔒 mail.google.com  ↻

'ronald...



Ronald Dupree

to me
Feb 22, 2019 Details

Kim,

We need to use our allotted time for depositions carefully.  I don't think the judge is going to permit this many depositions.   Important here to select people who personally witnessed Scott's abuse/assault on you or who themselves were subjected to his unwanted advances. (Especially to the extent that what they saw occurred within the relevant period of the case)

Right now, we have tentatively set the depos for the week of March 26th...

• • •



**Kimberly Webb**
Claire Wilson, Judy Phillips, and Yoselin were all present for the leg sweep. Please add them. Yoselin

4:17       5G E ▯

AA    🔒 mail.google.com    ↻

‹ 'ronald...       🗃 🗑 ▾

**K** to Ronald
Feb 25, 2019  Details

Claire Wilson, Judy Phillips, and Yoselin were all present for the leg sweep. Please add them. Yoselin immediately noticed the bruising and had an issue with Eric.

Dugas and Gonzalez witnessed an arm bar in his office. I yelled out how badly it hurt and B. Davis heard. Davis will be critical for us as a guy, he told chief before I was fired how Eric has been treating women for years.

• • •

**K** **Kimberly Webb** ↩
to Ronald
Feb 25, 2019  Details

I think it would be important to add Daryle Slaven. He was made aware of Eric's advances in 2014.

Jermey King witnessed an arm bar in 2014 which prompted the meeting with Slaven.

• • •

‹    ›    ⬆    ▯    ⧉

4:19

🔒 mail.google.com

'depos'

# Depos

**Kimberly Webb**
kimberlywebb10@gmail.com
Hide details

To: R Ronald Dupree

Date: March 18, 2019, 1:36 PM

Hey Ronald,

Did the depos get rescheduled?

**Kimberly Webb**
to Jared
2 days ago   Details

⬛ EXHIBIT
22-2

↩ Reply          ➡ Forward

4:20

5G E

AA    🔒 mail.google.com    ⟳

'aman...

**Amanda Hernandez**
to me
May 15, 2019  Details

This message has been modified to fit your screen. Tap here to show original.

Dear Ms Webb,

If we do not receive a payment for your remaining balance, we will be forced to suspend all legal work in your case.

**Amanda C. Hernandez**
Shareholder/Chief Financial Officer

KL Logo

**Kennard Hernandez P.C.**

2603 Augusta Drive | 14th Floor | Houston, Texas 77057

**Direct** 915.204.8928
**Office** 713.742.0900
**Fax** 713.742.0951
**Toll-Free** 855.KENNLAW

EXHIBIT
22-3

4:20   .ıll 5G E 🔋

AA   🔒 mail.google.com   ↻

'aman...   🗄 🗑 ▾

**Kimberly Webb**   ↰
to Amanda
May 16, 2019  Details

Ms. Hernandez,

  Please advise what the remaining balance is and I will make arrangements.
  I must say an e-mail forcing any suspension is disheartening. It has been over two years since retaining the firm and we have seen no real progress. Twice we have asked to speak to Mr. Kennard himself and have not had a return call. I feel like I am left in the dark on the case because I know absolutely nothing on where the case stands. We have paid over $30,000.00 to the firm and try our best to be professional and reasonable clients.

```
EXHIBIT
22-4
```

• • •

**Amanda Hernandez**
Thank you for your response Ms. Webb. I primarily deal with the finance side of things, and see that an

4:20                                    .ıll 5G E 🔋

'aman...                    📥    🗑    ▾

• • •

  **Amanda Hernandez**                    ↰
                        to me
                        May 16, 2019  Details

This message has been modified to fit your screen. Tap here to show original.

Thank you for your response Ms. Webb.  I primarily deal with the finance side of things, and see that an old invoice for $3444.85 is still outstanding from 2018.   We certainly do not want you to feel as though you are in left in the dark on your case.  I will be sure to relay your message to Mr. Kennard and Ms. Lemond so that they may answer any questions you might have.

Amanda C. Hernandez

Shareholder / Chief Financial Officer

4:20

ᴵᴵᴵᴵ 5G E ▭

AA 🔒 mail.google.com ↻

'aman...

**Connica Lemond**

to me

May 16, 2019  Details

Hi, Ms. Webb,

I am working on your case still, but there is an issue
that has come up.  The other side wants us to pay for
the appearance of the expert up front—that would be
about $1,500.00.  The expert has opined that your
actions amounted to both untruthfulness and
insubordination and would have led the chief to
terminate your employment with the City.  We believe
that the there is an issue with the chief issuing you an
order to submit to the polygraph immediately, but it is
unclear if this expert can opine on this issue.  If we
proceed with the matter, it would require the
prepayment of the expert.  Are you okay with this?

Connica Lemond

Senior Counsel

EXHIBIT
22-5

Case 4:17-cv-03828   Document 46-1   Filed on 02/10/20 in TXSD   Page 13 of 64

4:21       5G E

AA    🔒 mail.google.com    ↻

'aman...

**Kimberly Webb**
to Connica
May 16, 2019   Details

Is there a time we can talk today?

Did you see the ruling from Texas Department of Licensing (TDLR) that deemed the polygraph inaccurate?

She was ultimately fined.
She also admitted under oath to changing documents and claiming to lose documents in hurricane harvey

• • •

**Connica Lemond**
We can speak today, but I have meetings all afternoon, so it would be a short discussion. I am

**Kimberly Webb**
to Jared
2 days ago   Details

• • •

4:21

📶 5G E 🔋

AA   🔒 mail.google.com   ↻

'aman…   📥   🗑   ▾

hurricane harvey

• • •

**Connica Lemond**   ↰
to me
May 16, 2019   Details

We can speak today, but I have meetings all afternoon, so it would be a short discussion.  I am wide open tomorrow, however.

• • •

**Kimberly Webb**   ↰
to Jared
2 days ago   Details

• • •

↩ Reply          ➡ Forward

4:21

**KENNARD LAW PC**

to me

May 16, 2019   Details

This is the receipt for your purchase at Kennard Law, P.C..

## Order Information

Total Amount: USD **2000.00**

# This order is now complete. Transaction approved!

Here is your receipt:

```
==========  TRANSACTION RECORD
==========

KENNARD LAW PC

HOUSTON, TX 770576145

WWW.KENNARDLAW.COM

TYPE: Purchase
```

TYPE: Purchase

ACCT: Visa                          $ 2,000.00
USD

CARDHOLDER NAME  : Kimberly Eikenberg
CARD NUMBER       : ###########6019
DATE/TIME         : 16 May 19 11:05:39
REFERENCE #       : 001 0612390 T
AUTHOR. #         : 06213C
TRANS. REF.       :

        Approved - Thank You 100


Please retain this copy for your
records.

Cardholder will pay above amount to
card issuer pursuant to cardholder
agreement.
==============================
==========

4:25

.ılıl 5G E 🔋

AA     🔒 mail.google.com     ↻

'conni...          ⬇        🗑        ▾

# Good morning                    ☆

**Kimberly Webb**                  ↩
to Connica
Jun 23, 2019   Details

Hello and happy Sunday,

I was reaching out to let you know we will be on our vacation. My coverage might be iffy but there are some spots I get service. I was wondering how things were going? Is there anything you need from me?

Thanks!

↩                          ➡
Reply                      Forward

View Gmail in: **Mobile** | Older version | Desktop
© 2018 Google

EXHIBIT
22-6

4:25

.ıl 5G E

'conni…

Jun 23, 2019 Details

Friday, June 14, 2019, will be my last day with the firm. If you need assistance after that point, please contact June Augustine at june.augustine@kennardlaw.com or Fransheska Romero at fransheska.romero@kennardlaw.com. Thank you.

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

**Kimberly Webb**

4:25   .ıll 5G E 🔋

mail.google.com

'june.a...

# Hello   Inbox

**Kimberly Webb**
to june.augustine
Jun 23, 2019   Details

Good Morning June,

I am a little concerned and extremely baffled at this point. I had to find our Connica left the firm by sending her an e-mail. I received an impersonal automated response. No one at the firm has reached out to me to let me know and quite frankly I am worried, this is now the second attorney to leave within a matter of months. What is going on with my case?!

Please help me!!!!

EXHIBIT
**22-7**

Sent from my iPhone

**Kimberly Webb**
Please see the attached email. I am wondering about my case. If you could please help! Thank you

**Kimberly Webb**

4:25

5G E



AA   🔒 mail.google.com   ↻

'june.a…   

Please help me!!!!

Sent from my iPhone

---

 **Kimberly Webb**   ↩
to fransheska.romero@kennardlaw.com
Jun 25, 2019   Details

Please see the attached email. I am wondering about my case. If you could please help!

Thank you

• • •

---

 **Kimberly Webb**
Please help. I have yet to receive a response to what is going on. Can you help!

 **Amanda Hernandez**
Hi Ms. Webb, I'm sorry that you haven't gotten a response. I will certainly let Mr. Kennard know right

 **Kimberly Webb**   ↩
to Jared
6 hours ago   Details

Case 4:17-cv-03828 Document 46-1 Filed on 02/10/20 in TXSD Page 22 of 64

my case. If you could please help!

Thank you

• • •

**Kimberly Webb**
to Amanda
Jun 27, 2019  Details

Please help. I have yet to receive a response to what is going on. Can you help!


\---------- Forwarded message ---------
From: **Kimberly Webb**
<kimberlywebb10@gmail.com>
Date: Sun, Jun 23, 2019 at 4:35 AM
Subject: Hello
To: <june.augustine@kennardlaw.com>




• • •

**Amanda Hernandez**
Hi Ms. Webb, I'm sorry that you haven't gotten a
response. I will certainly let Mr. Kennard know right

4:25

.ıll 5G E 🔋

'june.a...      

  **Amanda Hernandez**  ↰

to me

Jun 27, 2019  Details

This message has been modified to fit your screen. Tap here to show original.

Hi Ms. Webb,

I'm sorry that you haven't gotten a response. I will certainly let Mr. Kennard know right away.

Amanda C. Hernandez

Of Counsel

**Kennard Law, P.C.**

2603 Augusta Drive | 14th Floor | Houston, Texas 77057

**Direct** 915.204.8928

**Office** 713.742.0900

**Fax** 713.742.0951

**Toll Free** 855.KENNLAW

amanda.hernandez@kennardlaw.com

Website / Bio / vCard / Map

HOUSTON / SAN ANTONIO / AUSTIN / EL PASO / RIO GRANDE VALLEY / SOUTHERN

    

4:27   📶 5G E 🔋

AA   🔒 mail.google.com   ↻

'Maria....

## Kimberly Webb
kimberlywebb10@gmail.com
Hide details

To: **A** alfonso.kennard@kennardlawfirm.com

Cc: **C** Cecily Perez

Date: July 17, 2019, 9:45 AM

Please see what I think is critical to include.

On page 5 I add it would be important to add the first TWC ruling. We won that case and it is important what she addressed! If you don't have the document I can find it. Also remember the City did not unanimously win the appeal.

If I can review the summary judgement before you submit it, I might be able to add more.

W Plaintiff Kimberly Webb ...

**EXHIBIT 22-8**

**Mail Delivery Subsystem**

M

4:27

5G E



'Maria....

**Kimberly Webb**
to Maria.maa@kennardlaw.com
Jul 17, 2019  Details

Please forward to Mr. Kennard.
The City mentions the Brady Letter from the DA as another reason to terminate. However, the new DA is in the process of removing the Brady Letter, as it specifically mentions the invalid polygraph for the means of the Brady.

Attached is an email

---------- Forwarded message ---------
From: **Will Durham** <wdurham@co.walker.tx.us>
Date: Fri, Feb 8, 2019 at 2:05 PM
Subject: RE: Additional Information
To: Kimberly Webb <kimberlywebb10@gmail.com>

• • •

Case 4:17-cv-03828   Document 46-1   Filed on 02/10/20 in TXSD   Page 26 of 64

AA   🔒 mail.google.com   ↻

'Maria....

# Hello Again   Inbox   ☆



**Kimberly Webb**
to Maria
Jul 18, 2019   Details

Sorry to bother you again! I've broke down the evidence I'd like to see in the summary judgement. This has been weighing heavily on my mind so it's all I think about.

Evidence

Memorandum from June 25, 2013

Audio recording from LT Jim Barnes



Case 4:17-cv-03828   Document 46-1   Filed on 02/10/20 in TXSD   Page 27 of 64

AA　　🔒 mail.google.com　　↻

'Maria....

Memorandum from June 25, 2013

Audio recording from LT Jim Barnes

Audio recording from Assistant Chief Slaven

Memorandum Dated March 3 written by me. This details the violence on which the complaint was about (not sexual) Complete with the texts messages that day about Scott's continuous behavior

Doctors Note confirming contusion

April 12th letter stating although we could have terminated, we didn't

4:28   5G E

'Maria....

behavior

Doctors Note confirming contusion

April 12th letter stating although we could have terminated, we didn't.

Amended termination letter

TWC - FIRST HEARING that we won!

Letter from Special Prosecution unit that said they would have taken our case but it would have to be forwarded to by chief or DA

TDLR investigator report

4:28

.ıll 5G E 🔋

🔒 mail.google.com

'Maria....

TDLR investigator report
        NOAV
        SOAH JUDGEMENT
        COMMISSION RULING
        Maria DENIAL

**Maria Maa**
to me
Jul 18, 2019   Details

You are definitely not bothering, I have forwarded all information to the attorney.

Thank you,

## Maria Maa

Executive Assistant

**Kennard Law, P.C.**
2603 Augusta Drive | 14th Floor | Houston, Texas 77057

**Direct** 346.980.8202
**Office** 713.742.0900
**Fax** 713.742.0951
**Toll Free** 855.KENNLAW
maria.maa@kennardlaw.com

Website / Map

HOUSTON / SAN ANTONIO / AUSTIN / EL PASO / RIO
GRANDE VALLEY / SOUTHERN CALIFORNIA
/ WASHINGTON D.C.



| | | |
|---|---|---|
| **First Assistant**<br>STUART HUGHES | **WILL DURHAM**<br>**CRIMINAL DISTRICT ATTORNEY**<br>**WALKER COUNTY, TEXAS** | **Executive Administrator**<br>SANDY GLISSON |
| **Assistants**<br>TAYLOR CARTER<br>DARIAN ETIENNE<br>PHILLIP FASELER<br>MICHAEL GUERRERO<br>JENNIFER JENKINS<br>MALORI MARTIN<br>QUENTIN RUSSELL | 1036 11th Street<br>HUNTSVILLE, TEXAS 77340<br>(936) 435-2441<br>FAX (936) 435-2449 | **Investigators**<br>MIKE CARLSON, CHIEF<br>DAVID COLLINS<br>JACK SHARP<br><br>**Victim Assistance Coordinators**<br>BETH MALAK<br>CHERYL LITTLE<br><br>**Hot Check Coordinator**<br>KATHERINE EVANS |

Mrs. Kimberly Webb                                                    January 24, 2020
P.O. Box 268
Oakhurst, TX  77359

Dear Kimberly,

Attached is a copy of a letter and accompanying documentation that was delivered to the
Huntsville Police Department on January 23, 2020.

Thank you for your attention to this matter.

Very Truly Yours,

Will Durham
Criminal District Attorney
Walker County, Texas

> **EXHIBIT**
> **22-9**

Attachments



**First Assistant**
STUART HUGHES

# WILL DURHAM
# CRIMINAL DISTRICT ATTORNEY
# WALKER COUNTY, TEXAS

**Assistants**
TAYLOR CARTER
DARIAN ETIENNE
PHILLIP FASELER
MICHAEL GUERRERO
JENNIFER JENKINS
MALORI MARTIN
QUENTIN RUSSELL

1036 11ᵗʰ Street
HUNTSVILLE, TEXAS 77340
(936) 435-2441
FAX (936) 435-2449

**Executive Administrator**
SANDY GLISSON

**Investigators**
MIKE CARLSON, CHIEF
DAVID COLLINS
JACK SHARP

**Victim Assistance Coordinators**
BETH MALAK
CHERYL LITTLE

**Hot Check Coordinator**
KATHERINE EVANS

Chief Kevin Lunsford
Huntsville Police Department
1220 11ᵗʰ Street
Huntsville, Texas 77340
Via Hand Delivery

January 23, 2020

RE:  Former Officer Kimberly Webb

Dear Chief Lunsford:

Attached hereto is a letter with associated documentation dated December 20, 2019, sent to me from the Executive Director of the Texas Department of Licensing and Regulation (TDLR).  This packet was received by my office on or about December 31, 2019.  In summary, TDLR, through its administrative hearing and appeal process, determined that a polygrapher named Maria Hubbard violated the Texas Administrative Code during a portion of the polygraph examination of Kimberly Webb which was conducted on or about April 18, 2017.

Accordingly, this improper conduct and final administrative decision calls into question the integrity and accuracy of this polygraph examination that was conducted on Webb and its results.  I felt this information was important for your department to be made aware of.  Therefore, this letter along with the attachments sent to my office by TDLR, is being sent to the Huntsville Police Department as a supplement to Webb's personnel file.  This information will give further disclosure and a more complete picture regarding the circumstances described in a letter dated April 21, 2017, signed by the former Walker County Criminal District Attorney which was placed in Webb's personnel file at your department.

Thank you for your attention to this matter.

Very Truly Yours,

Will Durham
Criminal District Attorney
Walker County, Texas



**TEXAS DEPARTMENT OF LICENSING & REGULATION**

Executive Office • PO Box 12157 • Austin, Texas 78711 • (512) 463-3173 • Fax (512) 475-2874

*www.tdlr.texas.gov*

December 20, 2019

Will Durham
District Attorney
1036 11th Street
Huntsville, Texas 77340

Re: TDLR Case No. POL20170018439
Kimberly Webb, Complainant

Dear Mr. Durham:

On January 11, 2019, the Texas Commission of Licensing and Regulation (Commission) issued a Final Order in the referenced case.[1]   In the Final Order, the Commission unanimously found that Maria Hubbard, a licensed Polygraph Examiner, while conducting a polygraph examination, engaged in acts banned by Section 88.75, Texas Administrative Code. The acts banned by code ensure polygraph examinations are used for intended purposes and conducted under circumstances that provide protections to anyone subject to the examination.[2]

If you have questions about Section 88.75, the Proposal for Decision, or the Final Order, please contact Brad Bowman, General Counsel, at 512-463-0859 or email brad.bowman@tdlr.texas.gov.

Sincerely,

Brian Francis
Executive Director

Copy:  The Honorable Ernest Bailes
State Representative, District 18

---

[1] The Commission adopted the Proposal for Decision including the Findings of Fact and Conclusions of Law issued by an Administrative Law Judge, State Office of Administrative Hearing, conducted on June 5, 2018. Copies are attached.

[2] See, https://www.tdlr.texas.gov/polygraph/polygraphrules.htm#8875

 **TEXAS DEPARTMENT OF LICENSING AND REGULATION**

*General Counsel's Office*
*P. O. Box 12157 • Austin, Texas 78711 • (512) 463-3306 • (800) 803-9202*
*Fax (512) 475-3032 • Web site: www.tdlr.texas.gov*

> ## PLEASE DO NOT IGNORE THIS IMPORTANT MATTER OR ALL OF YOUR TDLR ISSUED LICENSES MAY BE REVOKED FOR FAILURE TO PAY THE ADMINISTRATIVE PENALTY!

January 17, 2019

Maria Anna Hubbard
812 W. Dallas, St. Ste. 150
Conroe, TX 77301-2200

RETURN RECEIPT REQUESTED
VIA CERTIFIED MAIL NO.

91 7199 9991 7038 3621 1762

Maria Anna Hubbard
PO Box 481
Joshua, TX 76058-0481

RETURN RECEIPT REQUESTED
VIA CERTIFIED MAIL NO.

91 7199 9991 7038 3621 1755

RE:   TEXAS DEPARTMENT OF LICENSING AND REGULATION v. Maria Anna Hubbard; Docket No. 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.POL (TDLR Case #POL20170018439)

The Decision of the Commission (the decision) for your contested case is enclosed. The decision is an order that requires you to pay an administrative penalty (fine) or sanctions your license, or both. If you are ordered to pay a fine, you may pay by:

- Cashier's check or money order; **please write the above referenced case number on your payments.** Send payments to: Texas Department of Licensing and Regulation, General Counsel's Office, P.O. Box 12157, Austin, Texas, 78711.
- If you have ever been licensed with Texas Department of Licensing and Regulation you may pay online with a credit card. Follow payment instructions for your license type at: http://www.license.state.tx.us/PenaltyFeeOnlinePayment/PenaltyFeeOnlinePayment.aspx
- If you are unlicensed or need assistance contact the General Counsel's Office at 512-463-3306.

If you believe that there was a mistake or legal error in the enclosed decision, you may appeal the decision by filing a Motion for Rehearing (motion):

- Send a written motion to the General Counsel at the address or fax number shown above, or email to general.counsel@tdlr.texas.gov .

*Mike Arismendez, Chair – Shallowater, Texas*

*Tom Butler, Vice-Chair – Deer Park, Texas*
*Gerald R. Callas, M.D., F.A.S.A. – Beaumont, Texas*
*Helen Callier – Kingwood, Texas*

*Rick Figueroa – Brenham, Texas*
*Gary F. Wesson, D.D.S., M.S. – Bastrop, Texas*
*Deborah A. Yurco – Austin, Texas*

- The motion must list the specific Finding of Fact or Conclusion of Law in the enclosed order that you believe is in error.  We have enclosed some frequently asked questions about the Motion for Rehearing process.

- We must receive your motion no later than 25 days from the date the decision was signed by the Commission.

If your motion is received timely:

- We will notify you of the date and time of the next regular Commission meeting where the Commission will hear your motion.
- You and/or your attorney may appear before the Commission to present your motion, but you are not required to attend the Commission meeting.
- When you appear before the Commission, you must limit your statements to the specific mistakes in the order that you described in your written motion.
- For more information on this process, you may wish to view our YouTube video at https://youtu.be/SVnMJGK724U .
- If the Commission grants your motion, we will notify you of the next step.
- If the Commission denies your motion, you may appeal the decision to the Travis County District Court. You must file the appeal with the Travis County District Clerk no later than 30 days from the date the Commission denied your motion.

If you have questions about the information in this letter, you may contact the General Counsel's office at (512) 463-3306.

Sincerely,

Brad Bowman
General Counsel

Enclosure
BB/jmr

cc:     Enforcement Prosecutor, Texas Department of Licensing and Regulation

        The Honorable Casey A. Bell
        William P. Clements Bldg
        300 West Fifteenth St Ste 502
        Austin TX 78711-3925

FREQUENTLY ASKED QUESTIONS REGARDING THE DECISION OF THE COMMISSION ON YOUR CONTESTED CASE

1. WHAT IS THE DECISION OF THE COMMISSION?

> The Decision is an Order, SIGNED BY THE TEXAS COMMISSION OF LICENSING AND REGULATION (The Commission).  It orders you to pay an administrative penalty (fine) or it sanctions your license, or both.  You had a hearing before an Administrative Law Judge who issued a Proposal for Decision recommending certain action by the Commission.  The Commission issued this Decision during one of the Commission meetings you attended or were invited to attend.   The Decision includes Findings of Fact and Conclusions of Law regarding your case.

2. CAN I APPEAL THIS DECISION?

> Yes, you may appeal the decision before it becomes final if there was an error or mistake in the Findings of Fact or Conclusions of Law listed in the order.  The appeal is called a Motion for Rehearing.  Further information about a Motion for Rehearing can be found primarily in Subchapter F of the Texas Government Code.

3. HOW DO I MAKE AN APPEAL?

> (a) After the Commission has issued a decision regarding your case and you believe there is a mistake or error, you need to file a written Motion for Rehearing and send it to the General Counsel's office as described in the enclosed letter.

> (b) If you file a Motion for Rehearing, it must be received by the General Counsel's Office within 25 days from the date the order is signed or your Motion will not be considered, the order will become final, the sanctions will take effect, and the fine will be due.  The signature date of the order is on the last page.

4. I AM NOT A LAWYER.  DO I NEED TO HIRE A LAWYER TO FILE THE MOTION FOR REHEARING?

> You are not required to have a lawyer to file the appeal, although we recommend that you consult with an attorney if you have questions about your legal rights.  We cannot give private legal advice to you.

5. WHAT DOES THE MOTION FOR REAHEARING NEED TO SAY?

> The Department cannot give you legal advice regarding your case, but if you choose to file a Motion for Rehearing, you must identify very specifically each Findings of Fact or Conclusions of Law listed in the order that you believe are in error, and you must identify the legal and factual basis for the error that you claim.

EXAMPLE ONLY—THIS IS NOT FROM YOUR CASE:   Finding of Fact No. 7 says that Pretty Lady Beauty Salon is located at 1111 Main Street, Tyler, Texas.

If you believe there is is an error because you own Pretty Lady Beauty Salon and it has never been located at 1111 Main Street, Tyler Texas, you would state in your motion that Finding of Fact No. 7 is in error because the address of the salon is incorrect.

6.   MOTION FOR REHEARING RECEIVED TIMELY.

If you file a Motion for Rehearing that is received timely, you will be allowed to present your Motion before the Texas Commission of Licensing and Regulation at an upcoming Commission meeting. You will be notified by regular mail what the next date and time of the Commission meeting will be. You and/or your lawyer may come and present a statement to the Commission regarding your Motion. Your Motion will be considered and either granted or denied whether or not you/or your lawyer come to the meeting or make a statement there.

7.   PRESENTATION TO COMMISSION.

Your presentation will be limited to only the specific errors you identified in your Motion for Rehearing. You may not discuss matters that were not in the written Motion for Rehearing.

8.   MOTION FOR RHEARING GRANTED.

If the Commission **GRANTS** your Motion, the Order that had the errors in it will terminate and have no further effect. You will then hear from the department regarding the next step in the process.

9.   MOTION FOR REHEARING DENIED.

If the Commission **DENIES** your Motion, the Order becomes final on that day and you have 30 days, if you wish, to file a further appeal in the Travis County District Court, as stated in the enclosed letter.



**TEXAS COMMISSION OF LICENSING AND REGULATION**

**DOCKET NO. 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.POL**
**POL20170018439**

| | | |
|---|---|---|
| TEXAS DEPARTMENT OF LICENSING | § | BEFORE THE TEXAS COMMMISSION |
| AND REGULATION | § | |
| | § | |
| v. | § | OF |
| | § | |
| MARIA ANNA HUBBARD | § | LICENSING AND REGULATION |

### <u>DECISION OF THE COMMISSION</u>

This matter came for hearing before the Administrative Law Judge of the State Office of Administrative Hearings, commencing on June 5, 2018, pursuant to *Texas Occupations Code* Chapters 51 and 1703, *Texas Government Code* Chapter 2001, and *16 Texas Administrative Code*, Chapters 60 and 88. Being fully apprised of the facts and law pertinent to this case, we adopt the administrative law judge's findings of fact and conclusions of law, and incorporate them in their entirety as part of this decision. We find:

### <u>Findings of Fact</u>

1.  Maria Anna Hubbard is a polygraph examiner licensed by the Texas Department of Licensing and Regulation (the Department) under license number 1146, and has held such license for approximately 13 years.

2.  Ms. Hubbard is currently the vice president of the Texas Association of Polygraph Examiners, and was previously the association's secretary.

3.  On April 18, 2017, Ms. Hubbard administered a polygraph examination to Kimberly Webb, a Huntsville Police Department (HPD) peace officer who had been accused of texting sexually explicit images of herself to a male HPD officer's cell phone.

4.  Ms. Hubbard conducted the examination of Ms. Webb at the request of the HPD chief, who sought to determine from its results whether Ms. Webb had sent sexually explicit images of herself to a male HPD officer via text as alleged.

5.  Ms. Hubbard performed a pre-test interview of Ms. Webb and developed two relevant questions for the examination, both of which pertained to non-physical sexual activity, *i.e.*, whether Ms. Webb texted sexually explicit images of herself to the male HPD officer, along with other irrelevant and comparison questions.

6.   Ms. Hubbard found that the data obtained during the in-test phase of the examination concerning Ms. Webb's physiological reactions indicated that Ms. Webb was deceptive and untruthful in answering whether she texted sexually explicit images of herself to the male HPD officer.

7.   During the post-test phase of the examination, Ms. Hubbard asked Ms. Webb graphic questions pertaining to whether she had engaged in physical sexual activity with the male HPD officer. Ms. Hubbard's motive in asking these questions was to help Ms. Webb explain her physiological reactions during the test and prepare her for a second test.

8.   Ms. Hubbard was hopeful that Ms. Webb's physiological reactions that indicated deception during the in-test phase of the examination were the result of Ms. Webb's concern regarding concealment of a related matter, *i.e.*, physical sexual activity with the male HPD officer, that she had not disclosed to Ms. Hubbard.

9.   Ms. Hubbard believed that asking Ms. Webb whether she had engaged in physical sexual activity with the male HPD officer was appropriate under the circumstances and in keeping with best practices for a polygraph examiner.

10.  On May 4, 2017, the Department received a complaint from Ms. Webb alleging that Ms. Hubbard aggressively interrogated and accused, belittled, and demoralized her during the April 18, 2017 examination.

11.  On June 26, 2017, Department investigator Rachel Robbins sent Ms. Hubbard an email stating that Ms. Webb had filed a complaint against her and requesting that by July 11, 2017, Ms. Hubbard provide the Department with a written statement of her position on Ms. Webb's complaint and copies of all polygraph charts, question sheets, written reports, data sheets, films, audio and video tapes, opinions of the examiner from chart analysis, electronic records of examinations and other relevant documents pertaining to Ms. Webb's polygraph examination.

12.  On July 18, 2017, Ms. Robbins spoke with Ms. Hubbard by telephone. Ms. Hubbard told Ms. Robbins that she had been in Canada, that she receives approximately 300 emails every day, and that she was not sure if she had received Ms. Robbins's June 26 email.

13.  On July 19, 2017, Ms. Robbins sent Ms. Hubbard a letter via United States Postal Service and by email, again requesting the records and documents pertaining to Ms. Webb's examination and asking that Ms. Hubbard provide the requested records and documents, along with a written statement, by July 28, 2017.

14.  On July 31, 2017, Ms. Hubbard responded to Ms. Robbins's July 19, 2017 email, indicating that she had returned from out of state and providing a Dropbox link from which she stated that Ms. Robbins could access her audio recording of Ms. Webb's examination. Ms. Robbins was unable to access the recording via the Dropbox link.

15.  On July 31, 2017, Ms. Hubbard wrote Ms. Robbins a letter enclosing charts, a consent form, and a score sheet from Ms. Webb's polygraph examination. Ms. Hubbard paid someone from the front office staff where she works to go to the post office and mail the letter with the materials to Ms. Robbins.

*Texas Department of Licensing and Regulation v. Maria Anna Hubbard*
Final Decision Page 3

16.    Ms. Robbins was unable to access the audio recording of Ms. Webb's polygraph examination through the Dropbox link emailed by Ms. Hubbard, and left a phone message to that effect with Ms. Hubbard.

17.    Ms. Robbins did not receive any documents or records regarding Ms. Webb's polygraph examination through the mail from Ms. Hubbard.

18.    After July 19, 2018, Ms. Robbins did not communicate with Ms. Hubbard in writing regarding her inability to open the Dropbox link or failure to receive the other records and documents pertaining to Ms. Webb's polygraph examination.

19.    After she received the Department's November 30, 2017 Notice of Alleged Violation, Ms. Hubbard contacted the Department and communicated with Russel Taulli. Upon his request, she provided Mr. Taulli via email with a copy of her report of Ms. Webb's examination.

20.    On January 23, 2018, Department staff (Staff) sent Ms. Hubbard a Notice of Administrative Hearing. The hearing was rescheduled by an order issued by an Administrative Law Judge (ALJ) of the State Office of Administrative Hearings (SOAH). Together with the order, the Notice of Administrative Hearing advised Ms. Hubbard of the time, place, and nature of the hearing; the legal authority and jurisdiction under which the hearing was to be held; and the particular sections of the statutes and rules involved; and included a short, plain statement of the factual matters asserted or an attachment that incorporates by reference the factual matters asserted in the complaint or petition filed with the state agency.

21.    On June 5, 2018, the hearing was convened by ALJ Casey A. Bell at SOAH's facilities in Austin, Texas. Staff attorney Charlotte Melder represented Staff, and Ms. Hubbard appeared and represented herself. The record was left open until June 12, 2018, to allow the parties to submit supplemental evidence.

22.    Ms. Hubbard has no history of any previous violations of Department rules or other laws applicable to a licensed polygraph examiner.

## Conclusions Of Law

1.    The Department has jurisdiction and authority over this matter. Tex. Occ. Code chs. 51, 1703.

2.    SOAH has jurisdiction over the hearing in this proceeding, including the authority to issue a proposal for decision with proposed findings of fact and conclusions of law. Tex. Gov't Code ch. 2003; Tex. Occ. Code § 51.305.

3.    Ms. Hubbard received proper and timely notice of the hearing. Tex. Gov't Code §§2001.051-.052.

4.    Staff had the burden of proof in this proceeding. 1 Tex. Admin. Code § 155.427.

5.  A licensed polygraph examiner must retain for two years from the date of examination all polygraph charts, question sheets, written reports, data sheets, films, audio and video tapes, opinions of the examiner from chart analysis, electronic records of examinations and other relevant documents. 16 Tex. Admin. Code § 88.79(a).

6.  A licensed polygraph examiner must make available to the Department all records and other relevant documents required by law and Chapter 88 of title 16 of the Texas Administrative Code. 16 Tex. Admin. Code § 88.79(b).

7.  Staff failed to prove that Ms. Hubbard failed to make available to the Department all records and relevant documents pertaining to her polygraph examination of Ms. Webb.

8.  Ms. Hubbard violated 16 Texas Administrative Code § 88.75(c) by interrogating Ms. Webb regarding physical sexual activity with the male HPD officer, which was not a specific issue or relevant to the examination or necessary for the development of comparison questions.

9.  Pursuant to the Department's Enforcement Plan, Ms. Hubbard's violation of 16 Texas Administrative Code §§ 88.75(c) was a Class D violation. Tex. Occ. Code § 51.302(c); *https://www.tdlr.texas.gov/enforcement/polygraphsanctions.htm.*

10. For Ms. Hubbard's violation of a Department rule, the Department is authorized to assess an administrative penalty of up to $5,000 per day for each violation. Tex. Occ. Code §§51.301(2), .302(a).

11. For a first-time Class D violation, the Department's Enforcement Plan provides for an administrative penalty of $2,000 to $4,000 plus up to a one-year full suspension. *See https://www.tdlr.texas.gov/enforcement/polygraphsanctions.htm.*

12. In determining the amount of the administrative penalty, the Department must consider (1) the seriousness of the violation; (2) any previous violations; (3) the amount necessary to deter future violations; (4) any efforts to correct the violation; and (5) any other matter that justice may require. Tex. Occ. Code § 51.302(b).

13. In determining the amount of the administrative penalty, the Department also considers whether the violation was willful or intentional, and whether the licensee acted in good faith to avoid or mitigate the violation or correct the violation. *See https://www.tdlr.texas.gov/enforcement.htm.*

14. Ms. Hubbard should be assessed a $2,000 penalty for her violation.

## Order

NOW, THEREFORE, IT IS ORDERED by the Texas Commission of Licensing and Regulation that Respondent, Maria Anna Hubbard, shall remit an administrative penalty of two thousand dollars ($2,000) by cashier's check or money order payable to the Texas Department of Licensing and Regulation, OR by credit card payment, in accordance with Department procedures, no later than the 30th day after the date on which this Order is final as provided by Texas Government Code Section 2001.144.

*Texas Department of Licensing and Regulation v. Maria Anna Hubbard*
Final Decision Page 5

The Respondent has a right to judicial review of this order under Texas Government Code Section 2001.171. If the Respondent files a petition for judicial review, payment shall be made to the Department in accordance with Texas Occupations Code Chapter 51.

IT IS ORDERED that, in the event the final decision is appealed by the Respondent, the full cost of preparation of the transcript and all administrative costs authorized by Texas Government Code Chapter 2001 are hereby assessed against the Respondent.

*Texas Department of Licensing and Regulation v. Malka Anne Hubbard*
Final Decision Page 6

**SIGNED AND ISSUED** this the 11th day of January, 2019

| Approve: | Dissent: | Abstain: |
|---|---|---|
| Mike Arismendez<br>Chair | | |
| Thomas F. Butler<br>Vice Chair | | |
| Deborah A. Yurco | | |
| Rick Figueroa | | |
| Helen Callier | | |
| Gerald R. Callas, M.D., F.A.S.A. | | |
| Gary F. Wesson, D.D.S., M.S. | | |

Upload Date: 20180807132213          Account Number: 2396          Upload Description: 18-1790.POL.PFD

# State Office of Administrative Hearings



## Lesli G. Ginn
### Chief Administrative Law Judge

August 7, 2018

Brian Francis                                                    **VIA INTERAGENCY**
Executive Director
Texas Department of Licensing and Regulation
920 Colorado, 4th Floor
Austin, TX 78701

      **RE:**    **Docket No. 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.POL; Texas Department of Licensing and Regulation v. Maria Anna Hubbard**

Dear Mr. Francis:

      Please find enclosed a Proposal for Decision in this case. It contains my recommendation and underlying rationale.

      Exceptions and replies may be filed by any party in accordance with 1 Tex. Admin. Code § 155.507(c), a SOAH rule which may be found at www.soah.texas.gov

                              Sincerely,

                              Casey A. Bell
                              Administrative Law Judge

CAB/et
Enclosures (with 1 CD; Certified Evidentiary Record)
xc:    Charlotte R. Melder, Texas Department of Licensing & Regulation, 920 Colorado, Austin, TX 78701
     **VIA INTERAGENCY**
     Maria Anna Hubbard, 812 W. Dallas St., Ste. 150, Conroe, Texas 77301-2200 - **VIA REGULAR MAIL**

SOAH DOCKET NO. 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.POL
TDLR NO. POL20170018439

| | | |
|---|---|---|
| **TEXAS DEPARTMENT OF** | § | **BEFORE THE STATE OFFICE** |
| **LICENSING AND REGULATION,** | § | |
| **Petitioner** | § | |
| | § | |
| **v.** | § | **OF** |
| | § | |
| **MARIA ANNA HUBBARD,** | § | |
| **Respondent** | § | **ADMINISTRATIVE HEARINGS** |

## PROPOSAL FOR DECISION

The staff (Staff) of the Texas Department of Licensing and Regulation (TDLR or Department) seeks to impose a $4,000 administrative penalty against Maria Anna Hubbard, a TDLR-licensed polygraph examiner, for two alleged violations of TDLR rules. Ms. Hubbard contends that she did not commit the alleged violations and that no penalty should be imposed. After reviewing the evidence and considering the applicable law, the Administrative Law Judge (ALJ) finds that Staff proved one of the alleged violations and recommends that Ms. Hubbard be assessed a $2,000 penalty.

## I. JURISDICTION, NOTICE, AND PROCEDURAL HISTORY

There are no contested issues of jurisdiction or notice in this proceeding. These matters are addressed in the findings of fact and conclusions of law below.

The hearing was held on June 5, 2018, before ALJ Casey A. Bell at the State Office of Administrative Hearings (SOAH) in Austin, Texas. Staff was represented by attorney Charlotte Melder. Ms. Hubbard appeared and represented herself. At the conclusion of the hearing, the ALJ left the record open to allow the parties to submit supplemental evidence. On June 6, 2018, Staff submitted an additional phone log entry. At a later date, Ms. Hubbard submitted on a compact disc (CD) a copy of the audio recording of the polygraph examination and interview that is the subject of this case. Neither party filed any objection to the admission of the supplemental evidence. Therefore, Staff's phone log entry is admitted as Staff Exhibit W,

SOAH DOCKET NO. 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.POL          PROPOSAL FOR DECISION                    PAGE 2

and the CD submitted by Ms. Hubbard is admitted as Respondent Exhibit 3. The record closed on June 12, 2018.

## II. APPLICABLE LAW

The Department is responsible for implementing and enforcing the Texas Polygraph Examiners Act (Act).[1] Under the Act, a person who uses, for compensation or a law enforcement purpose, an instrument, including a polygraph, to detect deception or verify the truth of a statement must be licensed by the Department.[2]

Under rules adopted by the Texas Commission of Licensing and Regulation (Commission)[3] pursuant to the Act, a licensed polygraph examiner must not interrogate or conduct an examination on a subject's sexual behavior, unless the topic is a specific issue or is relevant to the examination or is necessary for the development of comparison questions.[4]

Commission rules also require licensed polygraph examiners to retain all polygraph charts, question sheets, written reports, data sheets, films, audio and video tapes, opinions from chart analysis, electronic records of examinations, and other relevant documents for two years so that they may be inspected by the Department pursuant to an investigation under chapter 51 of the Texas Occupations Code (Code).[5] Upon request, a licensed polygraph examiner must make these documents available to the Department.[6]

---

[1] Tex. Occ. Code (Code) ch. 1703.

[2] Code § 1703.201(a).

[3] The Department is governed by the Commission. Code § 51.051.

[4] 16 Tex. Admin. Code § 88.75(c).

[5] 16 Tex. Admin. Code § 88.79(a).

[6] 16 Tex. Admin. Code § 88.79(b).

SOAH DOCKET NO. 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.POL          PROPOSAL FOR DECISION          PAGE 3

The Department may impose an administrative penalty against a person who violates a rule adopted by the Commission.[7]  The amount of the penalty shall be no more than $5,000 per day for each violation.[8]  The Department has established a written Enforcement Plan that lists penalty ranges applicable to specific violations and the criteria the Department uses to set the amount of administrative penalties.[9]

Under the Enforcement Plan, interrogation of a subject regarding his or her sexual behavior when it is not a specific issue or relevant or necessary to develop comparison questions is a Class D violation.  The recommended administrative penalty for a first-time Class D violation is $2,000 to $4,000.[10]  The Enforcement Plan classifies a failure to make required records and documents available to the Department upon its request as a Class C violation.[11] The recommended penalty for a first-time Class C violation is $1,000 to $2,000.

The amount of an administrative penalty must be based on: (1) the seriousness of the violation; (2) any previous violations; (3) the amount necessary to deter future violations; (4) any efforts to correct the violation; and (5) any other matter that justice may require.[12]  Pursuant to its Enforcement Plan, the Department also considers whether the violation was willful or intentional, and whether the licensee acted in good faith to avoid or mitigate the violation or correct the violation.[13]  Staff recommends the Department impose a $3,000 penalty against Ms. Hubbard for the Class D violation and a $1,000 penalty against her for the Class C violation.

---

[7]  Code § 51.301(2).

[8]  Code § 51.302(a).

[9]  Staff Ex. V.  Code § 51.302(c) requires the Department to establish a written enforcement plan.  The Enforcement Plan is available at https://www.tdlr.texas.gov/enforcement/polygraphsanctions.htm.

[10]  Staff Ex. V at 5.  The Enforcement Plan also contemplates a one-year suspension of the person's license; however, in this case Staff has not sought or recommended a suspension of Ms. Hubbard's license.

[11]  Staff Ex. V at 4-5; https://www.tdlr.texas.gov/enforcement/polygraphsanctions.htm.

[12]  Code § 51.302(b).

[13]  Staff Ex. V at 2; https://www.tdlr.texas.gov/enforcement/polygraphsanctions.htm.

SOAH DOCKET NO. 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.POL          **PROPOSAL FOR DECISION**                    PAGE 4

## III. EVIDENCE

**A.     Background**

On May 4, 2017, the Department received a complaint from Kimberly Webb alleging that Ms. Hubbard aggressively interrogated and accused, belittled, and demoralized her during a polygraph examination on April 18, 2017.[14]   At the time, Ms. Webb was a peace officer employed by the Huntsville Police Department (HPD) and had been accused of sending sexually explicit images of herself to a male HPD officer.[15]   Ms. Webb indicated that she felt Ms. Hubbard was attempting to solicit a confession from her.   In a June 26, 2017 interview, Ms. Webb told Department investigator Rachel Robbins that she felt attacked and degraded by Ms. Hubbard, and that the experience was very traumatic.   Ms. Webb told Ms. Robbins that she felt Ms. Hubbard was interrogating her.[16]

**B.     Compliance with Department Request for Records and Documents**

On June 26, 2017, Ms. Robbins sent Ms. Hubbard an email stating that Ms. Webb had filed a complaint against her.[17]   The email requested that by July 11, 2017, Ms. Hubbard provide the Department with a written statement of her position on the matter, as well as copies of "all polygraph charts, question sheets, written reports, data sheets, films, audio and video tapes, opinions of the examiner from chart analysis, electronic records of examinations and other relevant documents."[18]

---

[14]  Staff Exs. H, L.

[15]  Staff Ex. O at 1.

[16]  *Id.*

[17]  Staff Ex. I.

[18]  *Id.*

On July 18, 2017, Ms. Robbins spoke with Ms. Hubbard by telephone. Ms. Hubbard told Ms. Robbins that she had been in Canada, that she receives approximately 300 emails every day, and that she was not sure if she had received Ms. Robbins's June 26 email. Ms. Robbins reported that Ms. Hubbard was unsure why Ms. Webb complained about being interrogated given that a polygraph examination is an interrogation. Ms. Hubbard also told Ms. Robbins that Ms. Webb has multiple problems and issues and had lost her job. Ms. Hubbard asked Ms. Robbins to resend the email, and said that she would send what documents she could from her phone but she would be unable to send the remainder of the documents until she returned the following week.[19]

On July 19, 2017, Ms. Robbins sent Ms. Hubbard a letter via United States Postal Service and by email, nearly identical to the June 26 email, indicating it was a second request and asking Ms. Hubbard to provide the requested records and documents regarding Ms. Webb, along with a written statement, by July 28, 2017.[20]  On July 31, 2017, Ms. Hubbard emailed Ms. Robbins, indicating that she had returned from out of state. The email provided a Dropbox link, which Ms. Hubbard stated would allow Ms. Robbins to access the audio recording of Ms. Webb's examination. Ms. Hubbard's email also indicated that she would be in her office and would "reproduce the hard copy" for Ms. Robbins.[21]

Also on July 31, 2017, Ms. Hubbard wrote Ms. Robbins a letter including a written response to Ms. Webb's complaint and enclosing charts, a consent form, and a score sheet from Ms. Webb's polygraph examination.[22]  Ms. Hubbard stated in the letter that she did not interrogate Ms. Webb about her sexual practices during the post-test interview, but asked her during the polygraph examination about possible sexual misconduct with a male officer "in order

---

[19] Staff Ex. L at 3.

[20] Staff Ex. J.

[21] Staff Ex. K at 1.

[22] Respondent Ex. 1.

to prepare relevant questions for a second series."[23]  The letter noted that the attached consent form reflected that Ms. Webb had been informed that questions of a sexual nature would be asked during her interview and polygraph examination.[24]

### 1.    Ms. Hubbard's Testimony

Ms. Hubbard testified that she received an email, a phone call, and a letter from Ms. Robbins in July 2017 requesting that she provide documents pertaining to Ms. Webb's examination. She only had an audio recording of Ms. Webb's examination because her attempt to videotape the examination had been unsuccessful.  According to Ms. Hubbard, she gathered her file on Ms. Webb's examination when she returned home from abroad on July 30 or July 31, prepared a Dropbox link for the audio recording and emailed it to Ms. Robbins, and mailed the remainder of the file materials to Ms. Robbins on July 31 or August 1.  She testified that she paid someone from the front office staff where she works to go to the post office and mail the materials to Ms. Robbins.  Ms. Hubbard has no documentation showing that these materials were mailed to the Department.  She testified that she did have a cash register receipt from the post office provided to her by the people she asked to mail the records, which showed how much postage had been paid.  However, she has been unable to locate that receipt, and suspects that it was in one of several boxes of records that were damaged in Hurricane Harvey last year.

According to Ms. Hubbard, after she made her submissions to the Department, she did not hear anything in response until mid-December 2017, when she received Staff's Notice of Alleged Violation (NOAV).[25]    Ms. Hubbard contended that the Department either lost or misplaced the packet of materials on Ms. Webb's examination that she mailed to the Department,

---

[23]  Respondent Ex. 1.

[24]  Id.

[25]  Staff Exs. E-F.

but admitted that she made a mistake by not sending the documents and records via certified mail.

Ms. Hubbard stated that she did everything in her power to comply with the Department's request for the documents and materials pertaining to Ms. Webb's polygraph examination. She testified that she has been a polygraph examiner for 13 years and has never failed to comply with any request from the Department, and that she offered her help to the Department when it recently assumed control over the regulation of polygraph examiners in Texas. Ms. Hubbard stated that it has been problematic to deal with the Department since that time, and that communication is often difficult because of a lack of knowledge within the Department regarding polygraph examiner regulation. According to Ms. Hubbard, she is the vice-president of the Texas Association of Polygraph Examiners, and was previously the association's secretary. She testified that she has received numerous calls from association members complaining about the Department's disorganization.

As an example of what she contended was the Department's disorganization, Ms. Hubbard noted that she updated her address with the Department on or about February 23, 2018, which was reflected in the Department's licensing database.[26] However, on May 18, 2018, the Department mailed a letter to Ms. Hubbard at her old address providing her a quarterly update on this case.[27] Ms. Hubbard also stated that when she was the association's secretary, she sent in training rosters to the Department, but the Department claimed it had not received them. She testified that the Education Division of the Department sent her a roster with proof showing she had entered the information regarding members' education hours. However, when members later applied to renew their licenses, the Department told them that their education hours had not been submitted.

---

[26] Staff Ex. A.

[27] Respondent Ex. 2.

SOAH DOCKET NO. 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.POL          PROPOSAL FOR DECISION                    PAGE 8

### 2.      Testimony of Rachel Robbins

Ms. Robbins testified regarding her communications to Ms. Hubbard in which she requested copies of Ms. Hubbard's documents and records pertaining to Ms. Webb's polygraph examination, as well as responses received from Ms. Hubbard. Ms. Robbins noted that she did not receive a response from Ms. Hubbard to her initial June 26, 2017 email requesting such items.  She confirmed that she spoke with Ms. Hubbard by phone on July 18, 2017, that Ms. Hubbard indicated she was out of the country and had not received the June 26, 2017 email, and that Ms. Hubbard asked that she resend the email.  She then emailed and mailed to Ms. Hubbard a request for the records.

Ms. Robbins received an email from Ms. Hubbard with the Dropbox link, but was unable to open it. She thought she sent Ms. Robbins an email letting her know that she could not open the Dropbox link.  However, Staff later filed the phone log indicating that Ms. Robbins had actually called Ms. Hubbard and left Ms. Hubbard a message on August 10, 2017, to that effect.[28]  Ms. Robbins testified that she never received any written documents regarding Ms. Webb's polygraph examination from Ms. Hubbard.  She acknowledged that after August 2017, she did not email Ms. Hubbard or contact her again to let her know that she had been unable to open the Dropbox link.

### 3.      Testimony of Jackie Revilla

Ms. Revilla is a senior legal assistant in the Department's Enforcement Division.  She has been with the Department for 16 years.  She testified generally regarding the Enforcement Plan developed by the Department,  how the Enforcement Division's Advisory Committee developed the penalties for each type of violation, and how the committee determines the appropriate penalty in a specific case.  Ms. Revilla stated that the proposed penalties in this case are common

---

[28] Staff Ex. W.

for the types of violations alleged against Ms. Hubbard.   Ms. Revilla testified that the May 18, 2018 letter sent to Ms. Hubbard's old address is a form letter that is automatically generated and mailed by law every quarter year to update licensees on pending enforcement cases.  She stated that the addresses for this type of letter are pulled from the licensee name cards kept in the Department's legal files, and that the addresses on those name cards may not be the Department's official addresses for those licensees.  The name cards are created at the beginning of an enforcement action, and if a licensee changes her address while the action is pending, the Department would still automatically send the quarterly letters to the address on the name card. If a licensee's address is updated through the Department's licensing database, the licensee's address reflected on the name card in the legal files has to be updated separately. Ms. Revilla did not know why the Enforcement Division could not just interface with the licensing database to obtain licensee addresses instead of creating the name cards.  She admitted that having separate legal files with addresses on the name cards that do not always match the addresses in the licensing database could cause human error.

## C.      Interrogation Regarding Ms. Webb's Physical Sexual Activity

The NOAV issued by Staff to Ms. Hubbard via letter dated November 30, 2017, set forth factual allegations pertaining to Ms. Hubbard's polygraph examination of Ms. Webb. Specifically, Staff asserted that the issue for Ms. Webb's examination was whether she had sent any videos or pictures to another person via her cell phone.  Staff claimed that Ms. Hubbard veered off that subject and began asking inappropriate questions regarding Ms. Webb's sexual behavior.[29]

After Ms. Hubbard received the NOAV, she called the Department and spoke with Russel Taulli, who requested a copy of her report of Ms. Webb's polygraph examination.  She sent Mr. Taulli a copy of the report which is slightly different from the original report, in that she

---

[29]  Staff Ex. E at 2.

made one edit that she testified was relevant.[30]  Specifically, she added a sentence to the Purpose of Examination section on page 1 of the report that reads as follows: "She [Ms. Webb] has denied engaging in any type of sexual relationship with Officer Scott or engaging in any type of behavior that is unbecoming of an officer or lying about her behavior to her superiors."[31] According to Ms. Hubbard, Ms. Webb made these denials in Ms. Hubbard's interview of her prior to administering the polygraph examination.[32]  Ms. Hubbard was not sure when she added this sentence to the report, but she testified that she added the sentence, after going back and listening to the audio recording of the examination, because she felt it was relevant.

According to Ms. Hubbard, she performed the polygraph examination of Ms. Webb under the direction of the HPD chief and the Huntsville city attorney.  She stated that she did not intend to belittle or hurt or upset Ms. Webb by her questioning, and noted that Ms. Webb agreed to take the exam and signed a consent form in which she expressed her understanding that she could be questioned on subject matter of a sexual nature that some people might consider offensive.[33]  Ms. Hubbard also noted that the consent form showed that Ms. Webb understood she could stop any portion of the interview or exam at any time.[34]

Ms. Hubbard explained that a polygraph examination consists of three separate parts: a pre-test interview, an in-test phase, and a post-test phase.  During the pre-test interview, rapport is established, health issues are discussed, the subject matter of the test is discussed, and all questions for the in-test phase are established and discussed.  The in-test phase involves the questioning of the test subject while monitoring the subject's physiology.  There must be at least

---

[30] The original report was received by Staff from Ms. Webb and is Staff Exhibit O, and the amended report sent by Ms. Hubbard to Mr. Taulli is Staff Exhibit N.

[31] Staff Ex. N at 1.

[32] A review of the audio recording of Ms. Webb's polygraph examination reveals that these denials were actually made during Ms. Hubbard's questioning of Ms. Webb after the test.  *See* Respondent Ex. 3.

[33] *See* Respondent Ex. 1 at 2.

[34] *Id.*

two charts run; best practices call for three charts run; and an examiner can run up to five charts run to obtain enough data to score the test.[35]  In the post-test phase, the examiner renders an opinion on the data collected.  If the data indicate to the examiner that the test subject was deceptive in his or her answers, the examiner should give the subject an opportunity to explain why he or she believes the data showed untruthfulness. Ms. Hubbard testified that Ms. Webb's physical sexual behavior became relevant in the post-test phase.

Ms. Hubbard testified that Ms. Webb's sexual behavior was "definitely" and "absolutely" a relevant issue to the polygraph examination, which concerned allegations of sexual misconduct.  She stated that the issue was whether Ms. Webb had engaged in sexual behavior with another male police officer by texting sexually explicit photographs or video of herself to the male officer.  According to Ms. Hubbard, for purposes of polygraph examinations, there are two types of sexual behavior, physical and non-physical. During the in-test phase, Ms. Hubbard asked Ms. Webb questions about non-physical behavior (*i.e.*, texting photographs or video). Ms. Hubbard stated that it appeared to her that Ms. Webb attempted to use physical countermeasures during her examination to "skew the data." However, even after accounting for Ms. Webb's countermeasures, Ms. Hubbard had sufficient data indicating that Ms. Webb was deceptive and untruthful in her answers.[36]  She stated that she has shown the charts from Ms. Webb's exam to several other polygraph examiners, who all concurred that the data indicated Ms. Webb was deceptive and used physical countermeasures.

Ms. Hubbard explained that there are different reasons why the data showed deception and why a person would use physical countermeasures. She stated that there is information on the internet that leads people to believe that if they do not employ such countermeasures, they will fail the examination.  Other people use the countermeasures to attempt to skew the true

---

[35]  Ms. Hubbard did not explain what a chart is, but from the context of her testimony and a review of Respondent Exhibit 1 (which includes charts) the ALJ concludes that a chart reflects measurements of a subject's physiological responses (*i.e.* breathing, movement, blood pressure, sweat) as he or she answers the questions.

[36]  *See* Staff Ex. O at 1, 3; Respondent Ex. 1.

Case 4:17-cv-03829   Document 46-1   Filed on 02/10/20 in TXSD   Page 56 of 64

SOAH DOCKET NO. 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.POL          PROPOSAL FOR DECISION                    PAGE 12

results of the examination if they are guilty of the allegation at issue. Ms. Hubbard testified that she was hopeful that Ms. Webb was suffering from an associative error, meaning she had not told Ms. Hubbard the complete and whole truth about the issue at hand, which caused a false positive result.

According to Ms. Hubbard, associative errors occur commonly in polygraph examination, and occur when a subject is "concerned about something else and not the actual issue at hand." Ms. Hubbard believed that perhaps Ms. Webb had engaged in a physical relationship with the male officer, and that Ms. Webb's concern about concealing the physical sexual behavior affected her physiological reactions when answering the questions about the non-physical sexual behavior during the in-test phase. Therefore, Ms. Hubbard said, she questioned Ms. Webb about physical sexual conduct in the post-test phase to find out if that was the case. Ms. Hubbard explained that her questions to Ms. Webb about physical sexual activity with the male officer were intended to prepare Ms. Webb for a second test. Ms. Hubbard testified that her questions in preparation for a second test were appropriate for an examiner in that situation and constituted best practices under the circumstances. However, she found Ms. Webb unsuitable for a second test because she was extremely emotional. Moreover, because Ms. Webb made no additional admissions during the post-test phase, there was nothing else over which to test her.

## IV. ANALYSIS AND RECOMMENDATION

### A.    Production of Records and Relevant Documents

As to the allegation that Ms. Hubbard did not make available to the Department upon its request all records and relevant documents concerning Ms. Webb's polygraph examination, Staff failed to meet its burden of proof. It is undisputed that Ms. Hubbard was in contact with Ms. Robbins on July 18, 2017, regarding the Department's request for the records and

documents.  The evidence also showed that Ms. Hubbard was out of the country during much of the summer of 2017, but that when she arrived home at the end of July, she emailed Ms. Robbins and included a Dropbox link to the audio recording of Ms. Webb's examination.  There was no further written communication from Ms. Robbins informing Ms. Hubbard that she was unable to open the Dropbox link.  Although it appears Ms. Robbins called Ms. Hubbard and left her a message to that effect, there is no evidence that Ms. Hubbard received the message. Ms. Hubbard's testimony that she sent someone on July 31 or August 1 to mail the documents and records requested by Ms. Robbins to the Department was credible and uncontroverted. Further, Ms. Hubbard contacted the Department once she received the NOAV and provided her polygraph examination report to the Department via email.

While Ms. Hubbard may not have provided all of the requested records and documents by the deadlines set by Ms. Robbins or prior to the issuance of the NOAV, her actions and the documents in the Department's possession indicate that Ms. Hubbard made those records and documents available to the Department.  The ALJ notes that there is no timing requirement or deadline in the Department's rules for a polygraph examiner to make records and documents available to the Department.  Also, the testimony of Ms. Hubbard and Ms. Revilla established that the Department's own record-keeping procedures may be a source of communication difficulties with licensees.  Therefore, Staff failed to prove by a preponderance of the evidence that Ms. Hubbard violated 16 Texas Administrative Code § 88.79(b) as alleged.

**B.    Interrogation of Ms. Webb Regarding Physical Sexual Activity**

Whether Ms. Hubbard violated 16 Texas Administrative Code § 88.75(c) as alleged is a more difficult question.   There is no dispute that the subject of Ms. Webb's polygraph examination was of a sexual nature, given that Ms. Webb had been accused of texting sexually explicit photographs and video to another HPD peace officer.  The evidence showed that Ms. Hubbard was hired by the HPD chief to administer the polygraph exam to Ms. Webb.

Ms. Hubbard stated in her pre-test interview of Ms. Webb that the HPD chief specifically wanted to know if Ms. Webb had texted sexually explicit images of herself to the male officer.[37] In the pre-test interview, Ms. Hubbard, with Ms. Webb's assistance, developed two relevant questions concerning texts of sexually explicit images, along with irrelevant and comparison questions.[38] During the in-test phase, Ms. Hubbard only asked Ms. Webb those questions developed during the pre-test interview, which concerned non-physical sexual activities.[39]  Nevertheless, Ms. Hubbard went beyond those questions in the post-test phase and asked Ms. Webb graphic questions pertaining to whether she had engaged in any type of physical sexual activity with the male officer.[40]

A polygraph examiner may not interrogate on the subject's sexual behavior unless that topic is a specific issue or is relevant to the examination.[41] The term "sexual behavior" is very broad and would encompass physical sexual activity between Ms. Webb and the male officer. However, there is no evidence that Ms. Webb was involved in or had been accused of engaging in a physical sexual relationship with the male officer. Rather, the allegation was that Ms. Webb had sent the officer text messages with sexually explicit photographs or video of herself. Therefore, whether Ms. Webb had physical sexual contact with the male officer was not a specific issue for the examination.

As to whether the questions regarding physical sexual activity with the male officer were relevant to the examination, Ms. Hubbard claimed that she asked such questions in an attempt to

---

[37] Respondent Ex. 3.

[38] Respondent Ex. 3; Staff Ex. O at 2.

[39] Staff Ex. O at 2.

[40] The ALJ will not repeat verbatim the questions asked of Ms. Webb by Ms. Hubbard in the post-test phase that are at issue, but finds that the audio recording in Respondent Exhibit 3 reveals that Factual Allegation No. 4 in Staff's Notice of Administrative Hearing is accurate in its recitation of those questions.

[41] 16 Tex. Admin. Code § 88.75(c). The rule also allows for interrogation regarding sexual behavior if necessary for the development of comparison questions, but Ms. Hubbard did not contend that her questions were for such purpose.

help Ms. Webb and prepare her to take a second test after the initial test indicated she was deceptive in her answers regarding texts of sexually explicit images. However, there is no evidence that Ms. Webb agreed to take a second test or that Ms. Hubbard was authorized by the HPD chief to administer a second test. Considering the specific subject matter of the examination as determined by the HPD chief and the allegations against Ms. Webb, the relevant questions developed in the pre-test interview and asked during the in-test phase dealt solely with alleged transmission by text message of photographs and video of a sexual nature. Therefore, Ms. Hubbard's interrogation of Ms. Webb during the post-test phase regarding physical sexual activity between Ms. Webb and the male officer was not relevant to the examination.

Given that physical sexual activity between Ms. Webb and the male officer was not the specific issue nor relevant to the examination, Ms. Hubbard violated 16 Texas Administrative Code § 88.75(c) by interrogating Ms. Webb on that topic. The Department is authorized to impose a penalty against Ms. Hubbard for this violation.[42]

## C.    Appropriate Sanction

With respect to the appropriate sanction for this violation, the Department's Enforcement Plan calls for a $2,000 to $4,000 penalty plus up to a full year's suspension of Ms. Hubbard's license.[43] In reviewing the factors the Department considers in determining the amount of a penalty, the ALJ notes that Ms. Hubbard's violation was somewhat serious, in that she asked Ms. Webb sexually graphic questions of a highly personal nature. However, its seriousness was tempered given the subject matter of the examination. The violation was willful and intentional in the sense that Ms. Hubbard had a purpose and reason for asking the questions, although she testified that it was in an attempt to assist Ms. Webb to explain her initial test results and prepare

---

[42] Code § 51.301(b).

[43] As previously mentioned, Staff did not seek or recommend suspension of Ms. Hubbard's license, and for the reasons set forth in this section, the ALJ agrees that a license suspension is not warranted.

her for a second test. Ms. Hubbard appeared to sincerely believe that her asking the questions was helpful to Ms. Webb, so the ALJ finds she acted in good faith to mitigate the violation. There was no evidence that Ms. Hubbard had engaged in any similar violations in the past. Given Ms. Hubbard's standing in the polygraph examiner community as the current vice-president and prior secretary of the Texas Association of Polygraph Examiners and her 13 years of experience with no other violations, a minimal penalty should have sufficient deterrent effect. Considering all of these factors, the ALJ recommends the Commission impose the minimum $2,000 penalty against Ms. Hubbard for the violation proven by Staff.

## V.     FINDINGS OF FACT

1.     Maria Anna Hubbard is a polygraph examiner licensed by the Texas Department of Licensing and Regulation (the Department) under license number 1146, and has held such license for approximately 13 years.

2.     Ms. Hubbard is currently the vice president of the Texas Association of Polygraph Examiners, and was previously the association's secretary.

3.     On April 18, 2017, Ms. Hubbard administered a polygraph examination to Kimberly Webb, a Huntsville Police Department (HPD) peace officer who had been accused of texting sexually explicit images of herself to a male HPD officer's cell phone.

4.     Ms. Hubbard conducted the examination of Ms. Webb at the request of the HPD chief, who sought to determine from its results whether Ms. Webb had sent sexually explicit images of herself to a male HPD officer via text as alleged.

5.     Ms. Hubbard performed a pre-test interview of Ms. Webb and developed two relevant questions for the examination, both of which pertained to non-physical sexual activity, *i.e.*, whether Ms. Webb texted sexually explicit images of herself to the male HPD officer, along with other irrelevant and comparison questions.

6.     Ms. Hubbard found that the data obtained during the in-test phase of the examination concerning Ms. Webb's physiological reactions indicated that Ms. Webb was deceptive and untruthful in answering whether she texted sexually explicit images of herself to the male HPD officer.

7.  During the post-test phase of the examination, Ms. Hubbard asked Ms. Webb graphic questions pertaining to whether she had engaged in physical sexual activity with the male HPD officer. Ms. Hubbard's motive in asking these questions was to help Ms. Webb explain her physiological reactions during the test and prepare her for a second test.

8.  Ms. Hubbard was hopeful that Ms. Webb's physiological reactions that indicated deception during the in-test phase of the examination were the result of Ms. Webb's concern regarding concealment of a related matter, *i.e.*, physical sexual activity with the male HPD officer, that she had not disclosed to Ms. Hubbard.

9.  Ms. Hubbard believed that asking Ms. Webb whether she had engaged in physical sexual activity with the male HPD officer was appropriate under the circumstances and in keeping with best practices for a polygraph examiner.

10. On May 4, 2017, the Department received a complaint from Ms. Webb alleging that Ms. Hubbard aggressively interrogated and accused, belittled, and demoralized her during the April 18, 2017 examination.

11. On June 26, 2017, Department investigator Rachel Robbins sent Ms. Hubbard an email stating that Ms. Webb had filed a complaint against her and requesting that by July 11, 2017, Ms. Hubbard provide the Department with a written statement of her position on Ms. Webb's complaint and copies of all polygraph charts, question sheets, written reports, data sheets, films, audio and video tapes, opinions of the examiner from chart analysis, electronic records of examinations and other relevant documents pertaining to Ms. Webb's polygraph examination.

12. On July 18, 2017, Ms. Robbins spoke with Ms. Hubbard by telephone. Ms. Hubbard told Ms. Robbins that she had been in Canada, that she receives approximately 300 emails every day, and that she was not sure if she had received Ms. Robbins's June 26 email.

13. On July 19, 2017, Ms. Robbins sent Ms. Hubbard a letter via United States Postal Service and by email, again requesting the records and documents pertaining to Ms. Webb's examination and asking that Ms. Hubbard provide the requested records and documents, along with a written statement, by July 28, 2017.

14. On July 31, 2017, Ms. Hubbard responded to Ms. Robbins's July 19, 2017 email, indicating that she had returned from out of state and providing a Dropbox link from which she stated that Ms. Robbins could access her audio recording of Ms. Webb's examination. Ms. Robbins was unable to access the recording via the Dropbox link.

15. On July 31, 2017, Ms. Hubbard wrote Ms. Robbins a letter enclosing charts, a consent form, and a score sheet from Ms. Webb's polygraph examination. Ms. Hubbard paid

SOAH DOCKET NO. 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.POL          PROPOSAL FOR DECISION          PAGE 18

someone from the front office staff where she works to go to the post office and mail the letter with the materials to Ms. Robbins.

16.   Ms. Robbins was unable to access the audio recording of Ms. Webb's polygraph examination through the Dropbox link emailed by Ms. Hubbard, and left a phone message to that effect with Ms. Hubbard.

17.   Ms. Robbins did not receive any documents or records regarding Ms. Webb's polygraph examination through the mail from Ms. Hubbard.

18.   After July 19, 2018, Ms. Robbins did not communicate with Ms. Hubbard in writing regarding her inability to open the Dropbox link or failure to receive the other records and documents pertaining to Ms. Webb's polygraph examination.

19.   After she received the Department's November 30, 2017 Notice of Alleged Violation, Ms. Hubbard contacted the Department and communicated with Russel Taulli. Upon his request, she provided Mr. Taulli via email with a copy of her report of Ms. Webb's examination.

20.   On January 23, 2018, Department staff (Staff) sent Ms. Hubbard a Notice of Administrative Hearing.   The hearing was rescheduled by an order issued by an Administrative Law Judge (ALJ) of the State Office of Administrative Hearings (SOAH). Together with the order, the Notice of Administrative Hearing advised Ms. Hubbard of the time, place, and nature of the hearing; the legal authority and jurisdiction under which the hearing was to be held; and the particular sections of the statutes and rules involved; and included a short, plain statement of the factual matters asserted or an attachment that incorporates by reference the factual matters asserted in the complaint or petition filed with the state agency.

21.   On June 5, 2018, the hearing was convened by ALJ Casey A. Bell at SOAH's facilities in Austin, Texas.   Staff attorney Charlotte Melder represented Staff, and Ms. Hubbard appeared and represented herself.   The record was left open until June 12, 2018, to allow the parties to submit supplemental evidence.

22.   Ms. Hubbard has no history of any previous violations of Department rules or other laws applicable to a licensed polygraph examiner.

## VI.   CONCLUSIONS OF LAW

1.   The Department has jurisdiction and authority over this matter. Tex. Occ. Code chs. 51, 1703.

2.    SOAH has jurisdiction over the hearing in this proceeding, including the authority to issue a proposal for decision with proposed findings of fact and conclusions of law. Tex. Gov't Code ch. 2003; Tex. Occ. Code § 51.305.

3.    Ms. Hubbard received proper and timely notice of the hearing.   Tex. Gov't Code §§ 2001.051-.052.

4.    Staff had the burden of proof in this proceeding. 1 Tex. Admin. Code § 155.427.

5.    A licensed polygraph examiner must retain for two years from the date of examination all polygraph charts, question sheets, written reports, data sheets, films, audio and video tapes, opinions of the examiner from chart analysis, electronic records of examinations and other relevant documents. 16 Tex. Admin. Code § 88.79(a).

6.    A licensed polygraph examiner must make available to the Department all records and other relevant documents required by law and Chapter 88 of title 16 of the Texas Administrative Code. 16 Tex. Admin. Code § 88.79(b).

7.    Staff failed to prove that Ms. Hubbard failed to make available to the Department all records and relevant documents pertaining to her polygraph examination of Ms. Webb.

8.    Ms. Hubbard violated 16 Texas Administrative Code § 88.75(c) by interrogating Ms. Webb regarding physical sexual activity with the male HPD officer, which was not a specific issue or relevant to the examination or necessary for the development of comparison questions.

9.    Pursuant to the Department's Enforcement Plan, Ms. Hubbard's violation of 16 Texas Administrative Code §§ 88.75(c) was a Class D violation. Tex. Occ. Code § 51.302(c); *https://www.tdlr.texas.gov/enforcement/polygraphsanctions.htm*.

10.   For Ms. Hubbard's violation of a Department rule, the Department is authorized to assess an administrative penalty of up to $5,000 per day for each violation. Tex. Occ. Code §§ 51.301(2), .302(a).

11.   For a first-time Class D violation, the Department's Enforcement Plan provides for an administrative penalty of $2,000 to $4,000 plus up to a one-year full suspension. *See https://www.tdlr.texas.gov/enforcement/polygraphsanctions.htm*.

12.   In determining the amount of the administrative penalty, the Department must consider (1) the seriousness of the violation; (2) any previous violations; (3) the amount necessary

to deter future violations; (4) any efforts to correct the violation; and (5) any other matter that justice may require. Tex. Occ. Code § 51.302(b).

13.    In determining the amount of the administrative penalty, the Department also considers whether the violation was willful or intentional, and whether the licensee acted in good faith to avoid or mitigate the violation or correct the violation. *See* *https://www.tdlr.texas.gov/enforcement.htm.*

14.    Ms. Hubbard should be assessed a $2,000 penalty for her violation.

**SIGNED August 7, 2018.**

CASEY A. BELL
ADMINISTRATIVE LAW JUDGE
STATE OFFICE OF ADMINISTRATIVE HEARINGS