```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3   KIMBERLY WEBB                   .  C.A. NO. H-17-3829
                                     .  HOUSTON, TEXAS
 4   VS.                             .
                                     .
 5   CITY OF HUNTSVILLE POLICE       .  SEPTEMBER 2, 2020
     DEPARTMENT, et al               .  10:00 A.M. to 10:49 A.M.
 6

 7
                     TRANSCRIPT of STATUS CONFERENCE
 8             BEFORE THE HONORABLE ALFRED H. BENNETT
                    UNITED STATES DISTRICT JUDGE
 9


10
     APPEARANCES: (All participants appearing via Zoom or phone.)
11
     FOR THE PLAINTIFF:              RANDALL SCOTT POERSCHKE, JR
12                                   Attorney at Law
                                     5111 Center Street
13                                   Houston, Texas   77007

14


15   FOR THE DEFENDANTS:            WILLIAM SCOTT HELFAND
                                    SEAN O. BRAUN
16                                  Lewis Brisbois Bisgaard
                                       Smith LLP
17                                  24 Greenway Plaza
                                    Suite 1400
18                                  Houston, Texas   77046

19


20   OFFICIAL COURT REPORTER:       KATHY L. METZGER
                                    U.S. Courthouse
21                                  515 Rusk
                                    Room 8004
22                                  Houston, Texas   77002
                                    713-250-5208
23


24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.
```

P R O C E E D I N G S

*THE COURT:*  This is Cause No. 4:17-cv-3829, Kimberly Webb versus City of Huntsville Police Department, et al.

Will counsel, please, enter an announcement for the record.

*MR. POERSCHKE:*  My name is Scott Poerschke, attorney for Kimberly Webb.

*MR. HELFAND:*  Good morning, Your Honor.  Bill Helfand and Sean Braun for the City of Huntsville.

*THE COURT:*  Very well.  Counsel, the Court has before it plaintiff's opposed emergency motion to extend the scheduling order to depose witness and motion for leave to conduct discovery under Federal Rule of Civil Procedure 56(e), which is Document No. 54.  The Court has the response from the defendant at Document No. 57.

Counsel for the plaintiff, were there any other documents that the Court needed to be aware of?

*MR. POERSCHKE:*  No, Your Honor.  Even though some of this does track back to the motion for new trial that I filed previously on this matter.

*THE COURT:*  The Court is aware of those motions as well.

And counsel for the defense, were there any additional motions or documents that the Court needed to be aware of for the purposes of this hearing?

10:02:20  1       *MR. HELFAND:*  No, Judge, I don't think so.

2       *THE COURT:*  Very well.  We'll turn our attention to

3  the plaintiff, as it's the plaintiff's motion.  Counsel,

4  first -- all counsel, understand I've read your motion, I've

10:02:33  5  read the response, and so I'm quite familiar with it and you do

6  not need to rehash it.  You can point out something specific.

7  With that being said, I have a few questions.

8       Counsel for the plaintiff, I note, as I noted in

9  my August order, that most of the discovery that you are

10:02:54  10  seeking to obtain now was previously available to the

11  plaintiff.  I understand the argument has been made that due to

12  the, quote, "negligence," unquote, of prior defense -- I'm

13  sorry, plaintiff's counsel, that that discovery was not

14  obtained and you're seeking to obtain it now.

10:03:21  15       Just as importantly, my understanding, and as to

16  Chief Lunsford and Ms. Julie Connell (sic), that in regards to

17  the depositions sought there, that these two witnesses were

18  previously questioned under oath at the Texas Workforce

19  Commission and at a TCOLE hearing.  So, there is sworn

10:03:43  20  testimony that has been obtained from these two individuals.  I

21  would like an explanation as to why that testimony could not be

22  used for purposes of the summary judgment response.

23       Now, my last point in regards to the motion for

24  summary judgment filed by the defendants, I understand that

10:04:14  25  they specifically cited Chief Lunsford and Ms. Connell with the

10:04:20  1   knowledge that the plaintiff had been terminated for

2   insubordination, and those were the two individuals, for lack

3   of a better phrase, that they hung their hat on when it came to

4   their motion.  And so with that being said, I'll give you the

10:04:39  5   opportunity to point out anything specific that you want me to

6   understand, as well as respond to the questions and concerns

7   that I point out here this morning.  Counsel?

8        MR. POERSCHKE:  Yes.  And my connection is breaking up

9   a little bit, Your Honor.  I can hear you fine.  So if you

10:04:58  10  cannot hear me, please, let me know.  Okay?

11       THE COURT:  I can hear you just fine.

12       MR. POERSCHKE:  Okay.  Good.  Because I had to jump on

13  to use my cell phone for some reason.  Normally my iMac works,

14  but I'm not sure what the issue is.  It doesn't have the video

10:05:16  15  on.

16           Okay.  So to break down your question, Judge --

17  those are good questions, and I already have the answers for

18  them.  With regards to the grounds, essentially, upon which

19  discovery would be requested, I believe that there's two ways

10:05:29  20  that you can go with this.  The first way is based off of your

21  prior order, Your Honor, and in regards to the diligence of

22  Ms. Webb at which she attempted to get evidence of -- to refute

23  the City's motion for summary judgment, you had indicated in

24  your prior order, Your Honor, essentially that she was -- that

10:05:52  25  she had diligently monitored the case.  And I believe then that

10:05:55   1   that is -- those are facts that were interjected that allowed

2   you then to reopen the case.

3                So, what I have attempted to do in my motion for

4   discovery, essentially, is to highlight those actions upon

10:06:10   5   which my client took to also provide diligence with regards to

6   these deposition -- depositions that she requested at the time.

7   I have highlighted some communications with regards to her

8   interaction with her attorneys, and essentially there is an

9   e-mail indicating that communications that Mr. Kennard had with

10:06:35  10   Mr. -- is it Braun?  I'm sorry.

11                THE COURT:  Counsel --

12                MR. POERSCHKE:  Am I pronouncing your name right,

13   Sean?

14                MR. BRAUN:  Yes, you are.

10:06:41  15                THE COURT:  And, counsel, let me interrupt you.

16                MR. POERSCHKE:  Yes.

17                THE COURT:  Because I'm aware of that and I don't take

18   issue with the fact --

19                MR. POERSCHKE:  Okay.

10:06:47  20                THE COURT:  -- that the plaintiff herself specifically

21   directed her attorneys to take actions on her behalf and that

22   they failed to do so.  I have no issue with that, and I accept

23   that as a fact based upon the record that is before me.

24                With that being said though, however, I've

10:07:08  25   pointed out in my reading and understanding two specific

10:07:15  1    witnesses that would be germane to your response to the motion
        2    for summary judgment, specifically, again, Chief Lunsford and
        3    Ms. Connell.  And as of right now, those are the two
        4    depositions I'm considering.  But with that being said, it's my
10:07:37  5    understanding that both of these witnesses have previously
        6    given sworn testimony on the very issues that I would assume
        7    you would raise in a deposition for purposes of compiling your
        8    response.

        9            So, why is it that their prior sworn testimony is
10:07:58 10    not suitable for incorporation into your response?  Why would a
       11    deposition be necessary to capture -- and I hadn't seen the
       12    testimony, admittedly -- potentially capture the same testimony
       13    and same sworn statements?

       14        *MR. POERSCHKE:*  Okay.  Yes, Your Honor.  The short
10:08:18 15    answer on that is that there are issues with regards to my
       16    client's termination that are not contained in that F-5 hearing
       17    or to cite, Your Honor.  Now, to backtrack --

       18        *THE COURT:*  There were two hearings, Texas Workforce
       19    and TCOLE.  Are you saying that the information that you are
10:08:39 20    seeking is not contained in either of those instances?

       21        *MR. POERSCHKE:*  Yes, Your Honor.  Because essentially
       22    you have to remember that the City's legitimate reason for
       23    terminating my client involved two, two points.  They said that
       24    she was insubordinate and they said that she was essentially
10:08:59 25    untruthful.  Now, the insubordination arrises with her failure

10:09:04  1  to follow procedures and her alleged orders to participate in

2  the investigation.   That was covered extensively in the TWC

3  hearing.   It was covered extensively in the F-5 hearing.

4         The discovery that I'm seeking pays particular

10:09:19  5  attention and emphasis on the untruthfulness finding.   Now, the

6  untruthfulness finding was utilized to prohibit the D.A. of

7  Montgomery County to prohibit Webb from testifying in court,

8  essentially indicating that she had to be placed on a Brady

9  list.

10:09:36  10         Webb was also found to be untruthful in a

11  polygraph examination where she was asked questions directly

12  about her -- the sexual assault that she experienced by

13  Sergeant Scott.   As a result of that polygraph examination,

14  Webb was found to have been untruthful in holding that Scott

10:09:58  15  basically essentially sexually assaulted her.

16         But you can look and take a look at our Exhibit 7

17  attached to our motion for -- to reopen the case.   That is a

18  document written by Chief Lunsford that sort of indicates that

19  although you contend that Scott's conduct was motivated by or

10:10:18  20  somehow related to your gender, no evidence substantiated this

21  contention.   Therefore, on City's Exhibit No. 6, that's

22  Document 23-6, the chief indicated -- and this is in Ms. Webb's

23  termination letter -- that, therefore, based upon all the

24  information available at that time, an allegation you had been

10:10:41  25  untruthful during the investigation appeared valid.   Then the

10:10:46   1   chief indicates that you did not submit to that examination

2   regarding the irreconcilable statements between you and

3   Sergeant Scott and the results of your examination showed

4   deception indicated.

10:10:59   5           So, therefore, in order to combat the City's

6   legitimate reason regarding the untruthfulness finding, that

7   gets into the issue with regards to Sergeant Scott.  And

8   essentially the City's reason for finding Ms. Webb untruthful

9   was related to her untruthfulness and indicating to Chief

10:11:20   10   Lunsford and Mrs. O'Connell that she believed that Sergeant

11   Scott's conduct against her was motivated by some sort of

12   sexual predatory -- I think that the chief used the term

13   "gender issues."

14           And in that investigation, which involved --

10:11:37   15   contemporaneously with Webb's investigation, Sergeant Scott was

16   investigated.  Attached to our motion to reopen the case, we

17   have, you know, witness statements, essentially, recordings

18   that were made during the investigatory process with another

19   officer by the name of Ryann Kaaa, indicated to Ms. O'Connell

10:12:03   20   that -- that Scott, the sergeant, had attacked one of the

21   witnesses I requested to depose.  Her name was Stacey.  That

22   there was another witness Stephanie, that's another witness I

23   requested to depose, sent genitalia photos -- or Scott sent

24   genitalia photos to her.

10:12:25   25           Stacey also indicated -- or Ryann Kaaa indicated

10:12:29  1  that Stacey had made -- that they -- Scott had propositioned

2  him for sexual intercourse.

3          So, it has to do -- it's not really a very

4  difficult issue.  It's just that it has to do with that Scott

10:12:45  5  was a sexual predator and we can show that Scott did have

6  sexual predator and gender issues with regards to women, then

7  it's really not a stretch to say then that Webb was not

8  untruthful in stating that Scott's conduct was motivated by

9  gender.

10:13:03  10          So as a job -- you know, as a plaintiff's

11  attorney in employment law cases, it's my job to cast doubt or

12  to show how the City's legitimate reasons for terminating her,

13  especially with regards to the untruthfulness finding, which I

14  would say is the more important finding, because that

10:13:22  15  untruthfulness finding directly led to a letter by the

16  Montgomery County District Clerk -- the District Attorney that

17  indicated that, you know, Ms. Webb could not testify in court

18  anymore because of the untruthfulness finding against her.  And

19  then that relates directly back to the allegation that my

10:13:43  20  client was found untruthful about, and that has to do with the

21  gender issues that Scott's conduct was motivated by gender.

22          So, that is something that was not fully

23  developed.  It wasn't fleshed out at the F-5 hearing.  My

24  client may have testified to it to some extent, but in terms of

10:14:08  25  Bill Helfand's sort of -- the thrust that he had at the F-5

10:14:14   1   hearing was focused on the insubordination, not on this -- the

2   untruthfulness charge as it relates to Mr. Scott's conduct.

3   And that's why I am requesting --

4           THE COURT:   Counsel, let me interrupt you because --

10:14:27   5           MR. POERSCHKE:   Yes, Your Honor.

6           THE COURT:   -- I appreciate you focusing on those two

7   issues.   And you've also outlined five other potential

8   witnesses, and I can frankly tell you that in regards to most

9   of them, I didn't see a good cause standard being met in

10:14:50   10   regards to those.   Specifically, Mr. Helfand, who's an attorney

11   in this case, I think you outlined that he had a conversation

12   with a potential witness.   You've not sought the deposition of

13   the witness he had the conversation with.   But to the extent

14   that he had a conversation with a witness, that's what lawyers

10:15:15   15   do.   And that does not create or transform him into a witness

16   based upon what has been outlined.

17           You also outlined -- or mentioned Assistant Chief

18   Slavin, and I believe it was Senior Officer Davis.   And based

19   upon the reason for the termination, I'm not sure what Slavin

10:15:40   20   or Davis could speak to as to insubordination or

21   untruthfulness.   And then, finally, there was Stacey Smith and

22   Stephanie Thompson; and I did not see a sufficiently

23   articulated reason for those depositions.

24           So, again, the Court's inquiry was somewhat

10:16:01   25   limited to Lunsford and Connell as to potential depositions to

10:16:08  1  follow up with.  As I understand it, your point is that in

2  regards to the Texas Workforce examinations and the TCOLE

3  examinations as to Lunsford and Connell, that while they did go

4  into the insubordination, they did not go into untruthfulness,

10:16:30  5  which is another component that you want to test for purposes

6  of your response to the motion for summary judgment.  Did I sum

7  that up correctly?

8      MR. POERSCHKE:  That's correct, Your Honor.  And if

9  you would like for me, I can explain.  Slavin and Davis were

10:16:46  10  individuals that may have reported issues involving Scott to

11  the chief.  So that would have placed the chief on notice that

12  Scott had -- or the chief had had notice prior to the issue of

13  Ms. Webb coming in and making her complaint that the chief knew

14  about --

10:17:04  15      THE COURT:  Well, to the extent that you -- well, to

16  the extent that you are permitted to take the deposition of

17  Chief Lunsford, why wouldn't that be a preference of inquiry

18  with him as opposed to having these other two witnesses come in

19  and say that?

10:17:21  20      MR. POERSCHKE:  Well, it would, Your Honor, and I

21  guess, it would depend upon what Chief Lunsford would testify

22  to.  If he denied -- if he denied having conversations with

23  Slavin and Davis about these issues, then I guess then that

24  would then open the door up --

10:17:38  25      THE COURT:  Have you had -- have you had conversations

10:17:39   1   with Slavin and Davis?

2          MR. POERSCHKE:  No, I have not, Your Honor.  But my

3   client --

4          THE COURT:  So as to any potential conversation

10:17:47   5   between, for instance, Slavin and Lunsford, you have no

6   personal knowledge based upon a conversation with either Slavin

7   or Lunsford that a conversation has taken place; is that

8   correct?

9          MR. POERSCHKE:  Well, I don't have any personal

10:18:00  10   knowledge, but my client's husband spoke with Chief Slavin

11   about the issues that she experienced with Scott.  So my

12   client's husband can testify to that, if need be, Your Honor.

13          THE COURT:  Okay.

14          MR. POERSCHKE:  And then with regards to Davis, my

10:18:17  15   client can testify that she had a conversation with Davis

16   about -- Davis and then Davis indicated something to the effect

17   that he had reported these issues to the chief before.  So, I

18   have -- my client can testify to that, Your Honor.

19          THE COURT:  So if Chief Lunsford testifies one way,

10:18:39  20   you would be able to submit sworn testimony from someone in an

21   instance that it sounds like it would be based upon hearsay,

22   that this conversation took place?

23          MR. POERSCHKE:  Well, again, I mean, my client would

24   say -- well --

10:18:56  25          THE COURT:  She had a conversation.  It would be a

10:18:57    1    sworn statement based upon hearsay?

            2              *MR. POERSCHKE:*  Right.  Right.

            3              *THE COURT:*  Okay.

            4              *MR. POERSCHKE:*  I don't know -- it's not a -- my

10:19:06    5    client and my client's husband were not involved in the

            6    conversation that Slavin had with the chief or that Davis may

            7    have had with the chief, that's correct, Your Honor.

            8              *THE COURT:*  Okay.  Thank you, counsel.

            9              Now, let me turn my attention to the defense.

10:19:24   10    Counsel, as you've heard some of the concerns that I originally

           11    expressed to plaintiff's counsel regarding the existence of the

           12    Texas Workforce examination as well as TCOLE, but now here in

           13    federal district court, you're seeking a dismissal of the

           14    plaintiff's claims against your clients.  To that extent, to

10:19:48   15    the extent you're asking me -- Mr. Helfand, you've been before

           16    me over numerous years now and you know I don't mind shutting

           17    the door of the courthouse when the facts and the law calls for

           18    it.  But you have probably also heard me use the phrase, "I

           19    want everyone to have all the cards available before that

10:20:09   20    happens."

           21              To the extent that plaintiff is now before me and

           22    complaining that she does not have all her cards, specifically

           23    due to the, quote, "negligence," unquote, of her prior

           24    attorneys and that she would have been able to incorporate into

10:20:31   25    her response the potential deposition testimony of Chief

10:20:36  1   Lunsford and Ms. Connell -- and I'm focused on those two,

2   because it seems those were the two decision makers in her

3   termination based upon insubordination and being untruthful.

4   The simple fact that her prior counsel failed to take these

10:20:56  5   depositions when he should have and now you're asking me to

6   boot her out of court without having those two particular

7   cards, how does the Court reconcile these two issues as we move

8   forward?

9        MR. HELFAND:  Yes, Your Honor.  Well, let me say, we

10:21:22  10   start with the fact that Your Honor's order did not authorize

11   new discovery.  In fact, Your Honor precluded that relief based

12   upon what I would submit is a well-reasoned decision.  And

13   while I'm not here to apologize for Ms. Webb's prior counsel,

14   I'm not sure that they need an apology, Judge.  I certainly

10:21:45  15   respect the Court as both an experienced litigator and now a

16   very experienced judge, in believing that there may have been

17   negligence involved here, but I certainly understand for

18   reasons I'll get into in just a moment why Ms. Webb's counsel

19   chose not to ask questions of the two people involved in the

10:22:08  20   decision, as the Court has pointed out correctly, to fire

21   Ms. Webb.  That is Ms. O'Connell, the human resources director

22   for the city, and the chief of police, Chief Lunsford.

23        We all know as practitioners, that the more times

24   we ask questions, the more risk we run of getting equivocal

10:22:28  25   answers or the opportunity to repair damaging testimony that a

witness may perceive from prior events.

And so, again, I have my own opinions of Ms. Webb's counsel and their conduct in this case specifically, but I certainly understand, having -- and I think that this was implicit in what Your Honor said, but I want to be sure the record is clear, not just that Ms. O'Connell and Chief Lunsford testified before the Workforce Commission under oath and the SOAH judge in the TCOLE hearing, but that they were literally cross-examined by Ms. Webb, through her counsel, at both of those hearings.  And Ms. Webb was present at both of those hearings and therefore able to arm her counsel with information that they might need to do their cross-examination.

You know where we are, Judge, respectfully is, we're just beating a dead horse here, as the decision of the Workforce Commission shows, as the decision of the SOAH judge affirmed by the District Court in Austin shows, that Ms. Webb was fired for dishonesty and insubordination.  And I certainly understand Mr. Poerschke's difficulty in kind of synthesizing all of this coming to this event late.  But some of the things he's told the Court are just inaccurate.  And I want to clarify those.  But before I do, I want to point out that, again, the answer to the Court's first question is, if we stick to the order that you entered, Judge, then what Ms. Webb was authorized to do was submit into the summary judgment record evidence she claims she already had.  She told Your Honor

10:24:12   1   that -- she gave Your Honor some choices.  One was to set aside

2   the summary judgment, reopen the case and allow her to do some

3   of the things she's proposing to do now, like take a bunch of

4   depositions.

10:24:24   5            The Court rejected that proposal, because Rule 59

6   did not authorize it under these circumstances.  Rather what

7   the Court authorized was a limited alteration to the summary

8   judgment record, and it was -- and I understand -- and I

9   pointed this out to Mr. Poerschke when after we got the order,

10:24:41  10   Mr. Poerschke immediately wrote me and said, "Would you agree

11   we can now do depositions?"  I said, "No."  The Court set

12   September 3rd after an August order, to my understanding,

13   because the Court observed in its order that Mr. Poerschke had

14   said the plaintiff is already in possession of the evidence

10:24:58  15   that she needs.  She just needs you to reopen the record, let

16   her put this evidence in, and then the Court would rule again

17   on the summary judgment based upon that evidence.

18            So, the door -- the Court opened the door

19   slightly, and I think appropriately under the rules, and told

10:25:17  20   the plaintiff you can slip that letter in the little slot here.

21   And what the plaintiff is trying to do is knock the door open

22   and say, I'm starting over.  And so that isn't what the Court

23   authorized, first, and nor should it be, Judge, because

24   Mr. Poerschke's comments demonstrate the complete mistake that

10:25:37  25   the plaintiff has had in this case from day one and apparently

10:25:42   1   still has today.  And some of the things Mr. Poerschke said are

2   just inaccurate.  And, you know, I understand, because he's

3   trying to synthesize a lot of information.  I don't think it's

4   intentional, but I don't want the Court to go away with less

10:25:54   5   than a thorough understanding.  It's all, by the way, laid out

6   in the summary judgment.

7            Ms. Webb was the victim of a leg sweep, which

8   apparently was some kind of horseplay that several people in

9   the Huntsville Police Department thought was okay.  The chief

10:26:10  10   obviously did not.  But there's a video recording of Ms. Webb

11   standing in a room and then Sergeant Scott walks up behind her

12   and he sweeps her leg and she falls.  That's what happened.

13   She made a complaint about that, and the City was investigating

14   that.

10:26:30  15            I think the most -- in my own personal opinion,

16   the most negligent thing her lawyers at the time did was to try

17   to turn that into a gender discrimination claim.  And they

18   wrote a letter saying, She's complaining that that was

19   motivated by gender, that leg sweep.  Okay.  I don't see how

10:26:49  20   that works, but okay.  And you are now on notice that if you

21   fire her or take any action against her -- and the reason they

22   needed to do this, Judge, by the way, is because the evidence

23   ultimately played out, and Ms. Webb even admitted, that she was

24   involved in some of the horseplay as well.  But what her

10:27:04  25   lawyers at the time wrote was, If you take any action against

10:27:08 1   her, now you're retaliating against her for making a gender

2   discrimination claim.

3          Ms. Webb never provided any evidence that

4   Sergeant Scott was motivated to sweep her leg by her gender.

10:27:19 5   And, in fact, there was plenty of evidence that Sergeant Scott

6   was doing such stupid and inappropriate acts with both men and

7   women.  And so why Ms. Webb's lawyers wrote that letter, I'll

8   never know.  But if there was negligence in their conduct, I

9   think that that's probably where it lies.  I think that they

10:27:35 10   thought they were going to protect Ms. Webb from some

11   discipline of her own by writing that letter.

12          Instead what happened was, the City then had to

13   take the leg sweep incident and now investigate an allegation

14   of somehow gender based conduct.  And here's, Judge, where the

10:27:51 15   whole thing gets off track, and I'm sorry that Mr. Poerschke

16   has bought into this, which is he just told you all the things

17   he wants to do to prove that Sergeant Scott -- he's no longer a

18   sergeant.  He was actually demoted because of this leg sweep

19   incident -- that Sergeant Scott is a sexual predator.  What in

10:28:13 20   the world has that got to do with why this lady was fired?  She

21   wasn't fired for claiming he was a sexual predator.  She wasn't

22   fired for allegations of what he did to other people as it

23   relates to sexual conduct.  Ms. Webb was fired -- and Your

24   Honor has this in the record.  And I hope that you can take it

10:28:38 25   from me, Judge, but if you can't take it from me, take it from

10:28:41   1   another judge, the administrative law judge, as affirmed by the

2   Austin District Court, wisely did what I think this Court did

3   in ruling on the summary judgment, just set all of that aside,

4   because that's not why she was fired.  And what that

10:28:55   5   administrative law judge found, and this is where Mr. Poerschke

6   is incorrect, the administrative law judge made a finding of

7   both insubordination and dishonesty.

8          Now, the dishonesty is not the untruthfulness in

9   the polygraph examination.  It was -- it was certainly

10:29:17  10   reinforced by the finding by the polygraph examiner that

11   Ms. Webb was untruthful.  But in the Workforce Commission

12   hearing and in the TCOLE hearing, both Ms. O'Connell and Chief

13   Lunsford testified that they independently determined that

14   Ms. Webb was lying to them in the investigation.  And what was

10:29:37  15   she lying about?  She was lying about the nature of her

16   relationship with then Sergeant Webb.  The two of them had had

17   a -- what is often called sexting, s-e-x-t-i-n-g, relationship,

18   to which they both admitted.  But Ms. Webb claimed that she did

19   not instigate that relationship and that she did not find it to

10:30:06  20   be consensual.

21          Sergeant Scott and Ms. Webb both took a polygraph

22   examination on that issue, not whether Sergeant Scott is a

23   sexual predator and not whether Ms. Webb's leg sweep was sexual

24   in nature, but who started the relationship and whether it was

10:30:23  25   consensual.  And the polygraph examiner said Ms. Webb was

10:30:27   1   dishonest about that and that Sergeant Scott was honest about

2   that.

3                    Now, again, however, both the Workforce

4   Commission testimony and the TCOLE hearing testimony

10:30:42   5   demonstrate that Ms. O'Connell and sergeant -- excuse me, Chief

6   Lunsford both determined in their mind that Ms. Webb was lying

7   about that before the polygraph examination.  The

8   insubordination, Mr. Poerschke is partially right, not only

9   relates to Ms. Webb's conduct in refusing direct orders from

10:31:04  10   the chief to participate in the investigation, but also

11   Ms. Webb's tape-recorded, I guess the colloquial term would be

12   smart-mouthing the chief during his discussion with Ms. Webb.

13   And, again, Your Honor is not without a judicial determination

14   in this regard.  The ALJ actually cites the language that

10:31:32  15   Ms. Webb used in, again, if the Court will allow me, smarting

16   off to the chief in a conversation where the chief is trying to

17   have a professional discussion with one of his subordinates.

18   So, again, both Ms. O'Connell and the chief were present for

19   that.

10:31:45  20                    Ms. O'Connell said that, as the human resources

21   director, that such conduct is not tolerated within the City

22   and would always be the subject of adverse employment action

23   and often would be the subject of separation.  The chief said

24   that based upon the paramilitary organization of a police

10:32:03  25   department, which the Fifth Circuit and this Court have

10:32:05  1    recognized, that adherence to order and adherence to rank are

2    paramount of importance and that such insubordination is its

3    own basis for separation.

4                    So, the lady was fired for two reasons, Judge.

10:32:18  5    And both the chief and Ms. O'Connell have been, not just

6    testified, but cross-examined by Ms. Webb twice on these

7    issues.  The whole question of whether Sergeant Scott --

8                    THE COURT:  Excuse me, Mr. Helfand, and let me stop

9    you there --

10:32:35  10                   MR. HELFAND:  Okay.

11                   THE COURT:  -- because I think you're about to go to a

12   point that I want specific emphasis on.  I have a more basic

13   issue, and I appreciate the overview, again, about the facts

14   and as well from plaintiff's counsel.  But I'm facing a more

10:32:56  15   fundamental question, and that is, in regards to receiving into

16   the record an amended response to the motion for summary

17   judgment that would put the Court in a position to rule on the

18   motion for summary judgment filed by the defendant, I'll have a

19   fully briefed, fully loaded motion for summary judgment and by

10:33:28  20   the same token, a fully briefed, fully loaded response to that

21   motion for summary judgment.  I'm dealing with the fundamental

22   issue of fairness of having a complete factual record before

23   the Court.  And I have been alerted by the plaintiffs -- the

24   plaintiff, I'm sorry, that it cannot be a fully loaded response

10:33:57  25   without the testimony of certain witnesses.  And I've limited

10:34:02  1   my -- as you can see, to Chief Lunsford -- and I apologize, I

2   said Connell earlier, and it's O'Connell -- and to O'Connell,

3   those two particular witnesses.

4            And from your perspective as you go to this next

10:34:20  5   little area that you're about to, I assume, go into, is it fair

6   to say -- because admittedly, those two depositions in this

7   matter have not been taken.  Can the Court go forward and view

8   the response of the plaintiff as fully loaded without having

9   these two key factual witnesses under oath via deposition in

10:34:49  10  this case for purposes of the response and consider itself

11  fully informed on the facts before it issues a ruling on your

12  motion for summary judgment?  Do you understand what I'm

13  saying?

14            *MR. HELFAND:*  I most certainly do, Your Honor.  And,

10:35:04  15  again, I would reference the Court's conclusion to your order,

16  Docket No. 52, in which the Court granted a 60(b) motion but

17  denied a Rule 59(e) motion.  Now, having said that, this case

18  is still before you, Judge.  And obviously I know from my

19  experience with you, that you want to get it right.  So, I

10:35:29  20  think the construct that the Court has created at the moment

21  would not permit that, but understanding today -- this is

22  obviously the benefit of the opportunity to interact with the

23  Court directly -- understanding today what the Court thinks is

24  necessary, I certainly understand where you're coming from,

10:35:49  25  Judge, in terms of your questions.

10:35:51   1          So let me offer this.  I will say this.

2    Ordinarily my answer would be, Well, gosh, that's patently

3    unfair.  The plaintiff gets to see my motion for summary

4    judgment and then start taking depositions?  Okay.  I mean, on

10:36:07   5    a just that broad of a question, I would say, no, that's not

6    fair.

7          Let me offer this, Judge, if it helps move things

8    along.  Because this case -- again, these folks have testified

9    so many times.  They've been cross-examined so many times.

10:36:22  10    They're so clearly on the record of what happened here, that

11   I'm okay with it.  It suits the Court's purposes.  Because I

12   want this to be affirmed on appeal.  I think it will be as it

13   stands right now, but I want it to be affirmed on appeal.  So

14   if it suits the Court's purposes, I'm okay with a two-hour

10:36:41  15   deposition of each of these people that is focused on the

16   question of the reason that they fired this lady.

17          What I'm worried about, Judge, is -- because I'm

18   getting it from my client, is after the Court entered its order

19   in August, Ms. Webb is out talking to employees of the City,

10:36:58  20   saying the Court has determined that her summary judgment was

21   not appropriate, that her case is back on the docket and that

22   she needs to collect evidence about what a bad guy Mr. Scott

23   is.  And I don't want this being used to -- because it's a

24   small town, Judge, and he's still a cop up there.  I don't want

10:37:18  25   this to be used as Ms. Webb's revenge of Sergeant Scott.

10:37:22   1     *THE COURT:*  Well, let me interrupt you there, because

2  I think you've kind of hit the nail on the head, as far as my

3  solution goes.  And Mr. Helfand and -- counsel for the

4  plaintiff, how do you pronounce your last name?

10:37:34   5     *MR. POERSCHKE:*  It's Poerschke.  Like a purse and a

6  key, Your Honor.

7     *THE COURT:*  Poerschke.  Mr. Poerschke, not only am I

8  dealing with an issue of the plaintiff's relief in its motion,

9  but three lawyers talking.  There's another underlying issue

10:37:58   10  here with the way that the response has been filed as well as

11  other allegations in this case file, regarding previous

12  counsel.  And as it is now set up, there is a potential that

13  some lawyer may have to call his or her carrier and that can

14  somewhat be fixed right now in allowing some of the issues that

10:38:38   15  were not tended to earlier to be legally tendered to now.

16  Because then the Court will have before it a full and complete

17  record and there could not be a decision made on an incomplete

18  record which could then later be used against another counsel.

19  And sometimes when people fall under the bus, they want to be

10:39:07   20  under the bus.  Sometimes people fall under the bus

21  inadvertently.  And if you can reach a hand down and keep

22  someone from being under the bus professionally, I would hope

23  that we would all want to do that because, you know, but for

24  the grace go I.

10:39:23   25          And so with that being said, I think Mr. Helfand

10:39:27  1   has laid out and addressed the concerns that the Court has and

2   I think most specifically, Mr. Poerschke, it gives you what you

3   need for your response based upon my understanding of this case

4   file and what has been asserted thus far.  What the Court is

10:39:47  5   going to allow, you may take a two-hour deposition of Chief

6   Lunsford and a two-hour deposition of Ms. O'Connell.  It is to

7   be limited to the reasons that the plaintiff was terminated and

8   any prior sworn testimony that was given at the Workforce or

9   TCOLE hearing in regards to testing their credibility.

10:40:26  10          I don't want it to be a rehash of the Workforce

11   or the TCOLE, because I already have -- you have access to

12   that.  But if you think -- what I'm going at, if you think they

13   made a specific misrepresentation at either of those hearings

14   and you have proof of it, you can ask them about that such that

10:40:48  15   I can then determine, okay, this person has previously made a

16   misrepresentation under oath and you're bringing that to me for

17   purposes of their credibility only.

18          But the purpose of the deposition will be to

19   inquire as to why the plaintiff was terminated, because that is

10:41:08  20   the case that I have and that's the evidence that I will give

21   you access to.  Once you have taken these two depositions, then

22   you may incorporate whatever testimony, as can the defendant,

23   in a reply.  You can incorporate that into an amended response.

24   And then the Court believes it will be in a position to rule on

10:41:40  25   the motion for summary judgment.

10:41:44  1         Mr. Poerschke, is that clear?

2              *MR. POERSCHKE:*  Yes, Your Honor, just as long as that

3    what I've stated previously about the untruthfulness finding

4    and how that untruthfulness finding is related to --

10:41:58  5              *THE COURT:*  The termination.  I think Mr. Helfand has

6    put in writing and has told me here today, that the reason for

7    the termination was insubordination and dishonesty.  So both of

8    those can be the subject of the deposition, because those were

9    the reasons for the termination.

10:42:17  10             *MR. POERSCHKE:*  Right.  And then with regards to the

11   untruthfulness finding, that relates back to her deceptive

12   polygraph examination of which questions were asked of her

13   about Scott and her relationship with Scott and so that then --

14   those issues about Scott then factor into the City's legitimate

10:42:38  15   reason for terminating her under that untruthfulness category.

16             *THE COURT:*  I'm not going to give you a deposition

17   outline.  I'm giving you a deposition time limit and how you

18   inquire --

19             *MR. POERSCHKE:*  Right.

10:42:49  20             *THE COURT:*  -- the reasons for her termination

21   regarding insubordination and dishonesty is on you.  But your

22   clock is ticking.  You've got two hours to do it for each

23   witness.

24             *MR. POERSCHKE:*  Yes, Your Honor.

10:43:03  25             *THE COURT:*  All right.  Now, anything unclear about

10:43:08  1  where I stand on this, Mr. Helfand?

2       *MR. HELFAND:*  No, Judge, I appreciate that.  Can we

3  just have a deadline?  I'm happy to present these people very

4  promptly.  I'd like to just kind of keep this thing moving, if

10:43:19  5  we can.

6       *THE COURT:*  Right, and so would I.  Well, let me

7  address one other issue before I get to that.  Mr. Helfand, and

8  you are correct that under the August ruling, this was not

9  anticipated.  But once I got the emergency motion, the issue

10:43:36  10  was more framed for me and so I wanted to make sure -- like

11  you, I'm considering the potential rulings in New Orleans, and

12  I wanted to make sure all the t's were crossed and i's were

13  dotted as to what the plaintiff had available for purposes of

14  responding to your motion for summary judgment.

10:43:59  15       *MR. HELFAND:*  I understand, Judge, and I guess to your

16  benefit, you're the only one who's not constrained by your

17  rulings.  So to the extent that you find it appropriate to make

18  a change, we understand your decision to do so.

19       *THE COURT:*  Right.  And the final point that you

10:44:13  20  make -- and believe me, I very much considered the fairness to

21  your client.  You turned your cards over on the table and now

22  the plaintiff is going to get the opportunity to go out and

23  take a deposition having seen that and address specifically

24  some of the issues you raised.  I understand the box that that

10:44:32  25  puts you in and -- but I don't believe fundamentally that it's

going to alter your legal position based upon the way that

you've framed this record.  And so if we can cross a t and dot

an i by doing this, I think it's the appropriate thing to do.

And I think also by only taking two of the witnesses as opposed

to the seven and putting a time limit on it, that that's some

respect to the potential cost that your client is going to

incur as a result of this.  So, by way of your explanation to

your client, you can tell them that was my thinking.  And

believe me, I had in mind the potential impact on your side of

this as well.

        *MR. HELFAND:*  I appreciate that, Judge.  Again, I

don't think that this is that case.  There aren't any real

surprises.  And, again, we share your desire to get it right.

So if this makes the Court more comfortable that it will be

right, I will say, I'll warn the Court now, that I'm going to

use it as an opportunity to press you harder on the res

judicata issue, but I'm sure you'll take that up when I present

it.

        *THE COURT:*  Exactly.  Now, with that being said,

you -- I'll turn to what you inquired about, was a deadline.

It's September the 2nd.  When do you anticipate that these two

witnesses can be presented and get a transcript back?  When do

you think?  Do you think we can get it done by the end of the

month?

        *MR. HELFAND:*  Oh, absolutely, Judge.  I can present

10:46:19  1  them in the next 10 -- well, 14 days.

2          *THE COURT:*  Okay.  And then I think typically it

3  takes, you know, without a rush job on the transcript, it takes

4  a week or two.  So, we're probably looking at one, two -- if

10:46:40  5  you can get back the transcript by one, two, three -- the 30th.

6  That's four weeks.  That gives you some time, based upon your

7  calendars, to schedule it and then assume that we can get the

8  transcript back within a week or two.

9          How long after you get the transcripts,

10:47:02  10  Mr. Poerschke, will you be in a position to -- or how long will

11  it take you to file your amended response?

12          *MR. POERSCHKE:*  I think two weeks will be appropriate,

13  Your Honor.

14          *THE COURT:*  Okay.  So that's October the 14th.  Your

10:47:21  15  amended response will be due October the 14th.

16          Mr. Helfand, on your reply, it will be due -- is

17  October the 23rd sufficient, which is a week and a couple of

18  days afterwards?

19          *MR. HELFAND:*  Speaking for Mr. Braun now, yes, Judge,

10:47:53  20  we'll get it.

21          *THE COURT:*  Okay.

22          *MR. HELFAND:*  Easy for me.

23          *THE COURT:*  Easy for you.  Okay.

24          *MR. BRAUN:*  We can do it by the 23rd, Your Honor.

10:48:02  25          *THE COURT:*  October the 23rd.  So the amended response

10:48:05  1   will come in October the 14th -- no later than October the 14th
        2   and the reply will come in no later than October the 23rd,
        3   which will be -- and at that point it's on the Court's desk and
        4   the Court will be able to deal with it.
10:48:22  5               All right.  Gentlemen, having heard the Court's
        6   rulings on this, on these issues and the revised deadlines,
        7   Mr. Poerschke, any additional items for the Court this morning?
        8         MR. POERSCHKE:  No, Your Honor.
        9         THE COURT:  All right.  Counsel for the defense,
10:48:38 10   Mr. Helfand, any additional items for the Court this morning?
       11         MR. HELFAND:  No, Judge.  But thank you for letting us
       12   talk this through with you.  I think that that was very
       13   helpful.
       14         THE COURT:  Well, thank you, counsel.  And obviously,
10:48:51 15   you know, this is normally done in the courtroom, but in the
       16   middle of this pandemic everyone is adapting to this new world
       17   that we're in and I appreciate your professionalism in coming
       18   to the Zoom hearing.  I hope that your families and your staff
       19   are safe.  I looked forward to seeing you guys back in the
10:49:12 20   courtroom as soon as it's safe to do so.  But in the meanwhile,
       21   by all means make sure your families and staff remain safe.
       22   With that being said, thank you, gentlemen, and you are
       23   excused.  The hearing is adjourned.
       24         MR. HELFAND:  Thank you, Judge.  Same to you.
10:49:28 25         MR. POERSCHKE:  Your Honor, thank you for your time

```
10:49:29    1   today in holding this hearing.  I appreciate it very much, from
            2   the plaintiff.
            3           THE COURT:  Thank you, sir.
            4           MR. POERSCHKE:  All right.  Bye-bye.
10:49:34    5       (Concluded at 10:49 a.m.)
            6                           * * *
            7   I certify that the foregoing is a correct transcript from the
            8   record of proceedings in the above-entitled cause, to the best
            9   of my ability.
           10
           11   /s/ Kathy L. Metzger                    9-23-2020
                Kathy L. Metzger                  Date
           12   Official Court Reporter
           13
           14
           15
           16
           17
           18
           19
           20
           21
           22
           23
           24
           25
```