**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **KIMBERLY WEBB** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **NO. 4:17-CV-03829** |
| | § | **(JURY DEMANDED)** |
| **CITY OF HUNTSVILLE,** | § | |
| *Defendant.* | § | |
| | § | |

<u>**REPLY IN OPPOSITION TO THE CITY OF HUNTSVILLE'S**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>
**[refers to Dkt. 23]**

**TO THE HONORABLE JUDGE ALFRED H. BENNETT:**

COMES NOW, OFFICER KIMBERLY WEBB, Plaintiff, and files this reply in opposition to the City of Huntsville's ("City") motion for summary judgment.  [Dkt. 23]

1. **The Texas Workforce Commission ("TWC") and the State Office of Administrative Hearings ("SOAH") Proceedings do not have a Preclusive Effect on this Title VII Case.**

As a threshold matter, the City's affirmative defenses, res judicata and collateral estoppel, are not pled in any answer.  In a review of the pleadings filed in this case, the City has not filed any answer. "Res judicata is an affirmative defense which is considered waived if not specifically pleaded in the answer or an amended answer permitted under FED.R.CIV.P. 15(a)." *Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1199 (5th Cir. 1995) (citing *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 172 (5th Cir.1985); *Morgan Guaranty Trust Co. of New York v. Blum*, 649 F.2d 342, 344–45 (5th Cir.1981); *Henry v. First Nat'l Bank of Clarksdale*, 595 F.2d 291, 298 (5th Cir.1979), *cert. denied*, 444 U.S. 1074 (1980)).

Turning to the substantive issues, the City makes a legally unsupportable argument that Webb must be denied her right to challenge the City's violation of the laws because she pursued

an administrative process before the TWC to obtain unemployment benefits and, in effect, attempted to mitigate her damages.  The issue addressed during the TWC proceedings was whether Webb committed any misconduct.[1]  Likewise, the City also argues that Webb is again precluded, in another administrative process, to change her separation of license report, F-5, before the State Office of Administrative Hearings ("SOAH").  The purpose of the separation of license proceeding was to change her separation of license report from the City from a "dishonorable" to an "honorable."  The SOAH proceeding was held before an administrative law judge ("ALJ").   The issue addressed before SOAH, like the TWC, was whether Webb committed any misconduct.[2]

The City asserts that Webb's claims are precluded by res judicata and collateral estoppel on the basis that "the disputed facts Plaintiff raises in the instant action – the reason she was fired – are identical to the issues decided by the Commission and the ALJ." [Dkt. 23, p. 18.]  That assertion, however, is foreclosed to the defendants under the precedent of the Fifth Circuit, which rejected this very argument in *Bradberry v. Jefferson County*, 732 F.3d 540 (5th Cir. 2013), holding that an ALJ's order in a separation of license proceeding before SOAH, does not have any preclusive effect in the plaintiff's USERRA case.  "The issue of motivation remains an unresolved fact question." 732 F.3d at 551.[3]  The City cites this case as controlling authority, but the purpose

---

[1] A TWC hearing involves disputed issues about whether "misconduct" has been committed, as defined under Section 201.012 of the Texas Labor Code.

[2] "In answering this question, we start by repeating that the issue before the ALJ was whether 'the alleged misconduct occurred'; when there is insufficient evidence to show the claimed misconduct, the ALJ orders the report to be changed. TEX. OCC. CODE § 1701.4525(e). The report is significant because each law enforcement agency to which the officer later applies sees the report. In addition, the license of a law enforcement officer who is dishonorably discharged two times is suspended. TEX. OCC. CODE § 1701.4521. Our examination of these Texas statutes suggests to us that the ALJ needed to decide only whether there was enough evidence to allow the F–5 Report to reflect a dismissal due to misconduct."  *Bradberry v. Jefferson County*, 732 F.3d 540, 550 (5th Cir. 2013).

[3] Likewise, the Supreme Court recognizes that in employment cases, "there will seldom be 'eyewitness' testimony as to the employer's mental processes" and that unlawful discrimination should not be tolerated, "subtle or otherwise." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000) (quoting *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)). *See also U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714, n. 3 (1983)("As in any lawsuit, the plaintiff may prove his case by direct or circumstantial evidence. The trier of fact should

is unclear.  Yet here, as in *Bradberry*, the issue decided in these administrative proceedings were limited to specific issues regarding allegations of misconduct. In this federal litigation, on the other hand, Webb seeks to show the real reason for her termination.

The Fifth Circuit's decision in *Bradberry* is not new law. As one treatise points out, "[c]ourts have readily perceived that for purposes of preclusion, '[i]ssues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits be the same.'" 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4417, at 165 (footnote omitted). The Fifth Circuit agrees. "Collateral estoppel does not preclude litigation of an issue unless both the facts and the legal standard used to assess them are the same in both proceedings." *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1422 (5th Cir. 1995); *see also Cox v. DeSoto Cnty.*, 564 F.3d 745, 748 (5th Cir. 2009) (state unemployment agency's unreviewed decision favorable to the defendant did not have res judicata effect on plaintiff's ADEA retaliation claim), cert. denied, 558 U.S. 824 (2009); *see Frazier v. King*, 873 F.2d 820, 824 (5th Cir. 1989).[4]

In regards to the order entered by the state district court [City's Ex. 14], affirming the ALJ's decision relating to Webb's separation of license, the City relies upon *Levitt v. University of Texas*, 847 F.2d 221, 229 (5th Cir. 1988).  *Levitt* is not helpful to the City, however, because the plaintiff

---

consider all the evidence, giving it whatever weight and credence it deserves."). The jury must decide which party's explanation of the employer's motivations it believes. The Supreme Court in *Aikens* acknowledged:

> the question facing triers of fact in discrimination cases is both sensitive and difficult; . . . trial courts should not treat discrimination differently from other ultimate questions of fact; and the law often obliges finders of fact to inquire into a person's state of mind, which is as much a fact, although difficult to determine, as a person's state of indigestion.

*Aikens*, 460 U.S. at 716-17.

[4] "After reviewing the extensive case law on claim preclusion, we rely on the language in *Patsy* to hold that federal law does not preclude Frazier from pursuing her § 1983 claim. This holding permits plaintiffs to pursue administrative remedies without jeopardizing their § 1983 claims. This result is consistent with § 1983's purpose of protecting federal rights. In addition, it has the practical effect of encouraging plaintiffs to seek administrative remedies before turning to the federal courts. A contrary result would encourage plaintiffs to bypass administrative proceedings in order to preserve their claims under § 1983." *Frazier v. King*, 873 F.2d 820, 824 (5th Cir. 1989)

did previously raise claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, in Levitt I and, while Levitt I was pending, turned around and filed a second case (Levitt II) alleging "he was terminated from employment with UTEP because of bias or prejudice against him because he is Jewish." *Levitt*, 847 F.2d at 224.  These were the same claims raised in Levitt I, and the Fifth Circuit determined that they were barred. *Levitt* also relies upon *Kremer v. Chem. Const. Corp.*, 456 U.S. 461 (1982), which held that Title VII claims, if reviewed by a state court, will be given preclusive effect.  Here, Webb has not filed a Title VII claim that has been reviewed by a state court.[5]

Res judicata or collateral estoppel is designed to protect parties from multiple lawsuits, not to prevent parties from having the one and only lawsuit.  The City's authorities fail to provide any support for the proposition that a person forfeits her federal claims entirely because she attended an administrative hearing on entirely different issues. Rather, the City's authorities address a fundamentally different situation. They address a situation where a person seeks relief through the judicial system, where the claim is fully litigated to its conclusion – and then turns around and files the federal claim to try to get a second bite at the apple. Here, Webb seeks only her first bite.

### a.  Findings of the ALJ in the SOAH hearing are based upon the inaccurate and, possibly untruthful, testimony of Julie O'Connell.

The February 27, 2018 findings of the ALJ in the SOAH hearing [Dkt. 23-12], which the City curiously[6] relies upon to advance their alleged legitimate reason for termination, are primarily

---

[5] And likewise, the "final judgment" from the appeal of SOAH Docket No. 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.F5 [Dkt. 23-14], does not contain any language dismissing a Title VII claim.   Appeals of a final decision of a ALJ in an F-5 context are limited to affirming the agency's decision or reverse/remanding it.  *See* Administrative Procedure Act, Sections 2001.174(1) and (2).  The "final judgment" indicates that the agency's decision was affirmed.  [*Id.*]  It does not dismiss any Title VII claim or make any findings indicating that Webb was terminated (or was not terminated) for filing a complaint against Scott.  [*Id.*]

[6] Further analysis of this observation is contained in Section 4, *infra*.2

based upon the testimony of Julie O'Connell, who was, unfortunately for Webb, the only individual assigned to investigate Webb's March 3, 2017 complaint against Scott.   Overall, Webb submits O'Connell's testimony as evidence of retaliatory animus against her.   O'Connell inaccurately describes her interactions with Webb and, especially with regards to O'Connell's account of Webb's explanation of the 2013 text messages, a factfinder may also find that O'Connell's testimony is a blatant misrepresentation to the point of being completely untruthful. Obviously, O'Connell did not properly investigate Webb's March 3, 2017 complaint and wanted nothing more than to punish her, at least in the SOAH context, by upholding Webb's "dishonorable discharge," in retaliation for Webb's March 3, 2017 complaint against Scott.

**First,** O'Connell testified before the ALJ in the SOAH proceedings that Webb did not indicate at her first meeting with Webb that the leg sweep was sexual in nature. [Dkt. 40-2, at 30:58 – 31:05]  However, this is contradicted by Webb's initial complaint filed on March 3, 2017, whereby Webb clearly indicated that "I know I am not the only employee who had experienced such harassment from Scott, as other female employees have made statements about his behavior." [Dkt. 40-3] O'Connell was attempting to cast doubt upon Webb's veracity to make it appear that Webb had added a sexual component only after obtaining an attorney.

**Second,** O'Connell testified that there was a meeting setup on March 22 or March 23, 2017 between O'Connell and Webb whereby O'Connell would interrogate her.   O'Connell indicated that she had setup the meeting and Webb refused to attend.   O'Connell testified that Webb simply stated to her: "I'm not, I can't come."  [Dkt. 40-2, at 39:05 – 39:05]  O'Connell failed to inform the ALJ, however, that Webb had requested to hold off on the meeting because Webb wanted Kennard, or a member of his firm, to be present at the interview.   Said facts were referred to by Webb in her April 13, 2017 memorandum to Chief Lunsford, whereby Webb indicated that she had obtained counsel, specifically a member of Kennard's law firm, Ronald Dupree, on March 20,

2017. [Dkt. 40-4]   On March 22, 2017, Mr. Dupree indicated that Webb was represented by counsel and that further discussions needed to be directed to his attention. [*Id.*] Furthermore, on March 23, 2017, Webb sent an email directly to O'Connell indicating that she wanted to hold off on meeting. [Dkt. 46-5]   O'Connell was aware of the fact that Webb had obtained counsel, but insisted that Webb was somehow insubordinate by not meeting with her, and basically misrepresented to the ALJ that Webb had failed to provide O'Connell with a reason for refusing to do so.   A jury may infer that O'Connell was motivated by a desire to punish Webb for her March 3, 2017 complaint against Scott.

**Third**, and quite possibly the most egregious example of O'Connell's misrepresentations, or untruthfulness, involved the 2013 text messages, which formed the basis of the ALJ's findings #14, #15, and #27. [Dkt. 23-12, p. 13 - 14] O'Connell testified that Webb indicated to O'Connell that Webb had the text messages, but Webb refused to produce them. [Dkt. 40-1, at 50:39-51:08] However, in a recording made by Webb of one of her meetings with O'Connell, while O'Connell was interrogating Webb about her March 3, 2017 complaint, Webb explains to O'Connell that: "I don't know if I have the text or not." [Dkt. 40-2, at 18:24]   Later, before the ALJ, O'Connell claims that Webb's actions in refusing to turn over text messages was insubordinate, which O'Connell claims that Webb had possession of and, indeed, the ALJ also made this his finding.[7] [Dkt. 40-1, at 51:48 – 51:59] O'Connell also testified that Webb never provided O'Connell with an explanation why she did not turn over the text messages [Id., at 52:03 - 52:14], while Webb explained to O'Connell, during the investigation, that there were multiple issues with the reason why Webb could not obtain the text messages.  [Dkt. 40-2, at 18:24 – 19:24]

---

[7] For finding #15, the ALJ determined that Webb had stated that she had the text messages.  "[Plaintiff] failed to provide the Department of Director O'Connell with the text messages she claimed to have, despite several requests to do so and *her statement that they were in her possession*."  [City's Exh. 12 (emphasis added)]

**Fourth**, also regarding the 2013 text messages, O'Connell testified that Webb did not explain the reason why she waited years to raise the issue of the 2013 text messages.  [Dkt. 40-1, at 52:56- 53:04]  In Webb's April 13, 2017 correspondence to Chief Lunsford, however, Webb explained to Chief Lunsford that her husband, Jared Webb, had attended a 2014 meeting with Assistant Chief Slaven where Scott's sexually explicit pictures, comments, and witnessed assault were first brought to the attention of the Department.  [Dkt. 40-4]   Additionally, Webb further advised O'Connell of Jared's meeting with Slaven.  [Dkt. 40-2, at 24:07 – 24:47]

## 2. "But For" Causation.

As a threshold matter, the City challenges the causation as to the third prong of Webb's *prima facie* case, as well as "but for" causation.  Webb responds to both causation (under the third prong) and "but for" causation together and incorporates all prior briefing, *supra*, as if stated herein.

This case follows a similar set of facts as addressed by the Fifth Circuit in *Zamora v. City of Houston*, 798 F.3d 326, 334 (5th Cir. 2015).   For one, Officer Zamora's suspension "did not result from an Internal Affairs investigation of allegations of misconduct against him.  Instead, it resulted from an investigation prompted by [his father's] complaint that certain of Zamora's CRU supervisor had violated departmental policies, including the prohibition on truthfulness." *Zamora*, at 334.   Like *Zamora*, Officer Webb's termination did not result from an Internal Affairs investigation of allegations of misconduct against her, but from a complaint that she filed on March 2, 2017 [Dkt. 40-3] indicating that Eric Scott's leg-sweep conducted on February 28, 2017 was motivated by gender.  Like *Zamora*, as well, Webb was terminated on the basis of statements made by a supervisor, Eric Scott (who was not Webb's supervisor).

In addition to *Zamora*, Webb relies upon *City of Houston v. Trimmer-Davis*, No. 01-19-00088-CV, 2020 WL 4983253 (Tex. App. Aug. 25, 2020).  In *Trimmer-Davis*, the plaintiff, Officer

Trimmer-Davis, filed a complaint of discrimination against her supervisor, Sergeant Barfield.  In response, the City turned the investigation around on her, and found that Trimmer-Davis was untruthful and exonerated Sergeant Barfield.  *Id*., at *1. The First Circuit Court of Appeals noted:

> This case is novel because the suspension was inextricably linked to Trimmer-Davis's protected activity. The internal investigation was made based on her complaint alleging that Sgt. Barfield had discriminated against her based on her race and gender. Logically, that alone could satisfy the but-for standard of causation because the investigation that led to the suspension would not have occurred if Trimmer-Davis had not filed the complaint. *See* Smith, 2019 WL 1716418, at *5. The circumstantial evidence also supports a conclusion that Trimmer-Davis raised a question of fact about the true reason for the City's action because it is some evidence from which a factfinder could infer that retaliation was the real motive. *See* White, 655 Fed. Appx. at 1025.

Here, **Webb's complaint is likewise "inextricably linked" to Webb's protected activity, so much so, that if Webb had not filed it, she would not have been terminated.** There are no grounds, as advanced by the City, that are independent from the investigation and Webb's alleged conduct that resulted in response to inquiries relating to the investigation. Scott's statements lead Julie O'Connell and Chief Lunsford to conclude that the "leg-sweep" incident was "horseplay" and that Scott's conduct was not motivated by gender.   Likewise, Webb was terminated on the basis of statements made by Scott.    Chief Lunsford testified

Q:  Now, anything else to indicate that Ms. Webb was untruthful in the exchange of the sexually-related material?

A: Yes.

Q: What is that, sir?

A. Independently of the polygraph examination, you have the -- you have the testimony of both employees. They both -- they both claim something different. Both claims cannot be true. Therefore, we investigate it. Part of the other employee's confession to his part and her denial of her part is also independently a verification of her untruthfulness.

Q. In terms of -- now, the testimony of both employees, you're talking about the testimony of Eric Scott; is that correct?

A. Eric Scott and Kimberly Webb.

Q. Therefore, you determined that the testimony -- the testimony provided by Kimberly Webb relating to the exchange of sexually-related material was dishonest; is that right?

A. Yes.

Q. And the same testimony by Eric Scott of the exchange of sexually-related material was found to be honest; is that correct?

A. Yes.

[Dkt. 76-1, page 13, ll. 1 – 25 (excerpt)]  Independent of the botched polygraph examination, Chief Lunsford believed Scott and disbelieved Webb by using Scott's statements to find that Webb had committed misconduct.  These credibility determinations were made at the same time. Furthermore, a determination that Scott's conduct was not motivated by gender hinged upon a finding that the February 28, 2017 incident was "horseplay:"

Q. (By Mr. Poerschke) Now, with regards to the -- Ms. O'Connell's investigation did, in fact, determine that the conduct of the leg sweep was horseplay; is that correct?

A. Yes, that is correct.

Q. Okay. And then, you agree with that determination; is that right?

A. Yes.

Q. Now, in agreeing with that determination, you've also made the decision that the leg sweep was not motivated by gender; is that correct?

MR. HELFAND: Are you asking if he made that determination or if somebody else did?

MR. POERSCHKE: No, that he did.

A. Yes, correct.

[Dkt. 76-1, p. 9 - 23]  Webb has no prior record of any disciplinary history prior to the filing of her complaint of Scott.  Before her complaint, Webb was an exemplary police officer.  Webb

argues that a fact issue exists as to the reason why Chief Lunsford suddenly viewed Webb as being untruthful, even independent of the polygraph examination. Likewise, it is axiomatic, that the City, Chief Lunsford and Julie O'Connell had knowledge of Webb's March 2017 protected activity as they were supposed to investigate it. [Dkt. 76-1, p. 15, *ll*. 16 – 19]

### 3. Lack of a Thorough Investigation or "Sham" Investigation.

A reasonable juror could find from the evidence that the investigation in this case "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" and that they went well beyond "petty slights, minor annoyances, and simple lack of good manners." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). This is true because the investigation in Officer Webb's protected activity certainly resulted in her termination. Officer Webb's termination in this regard, stemming from her own protected activity, likely did dissuade City employees from filing any further complaints against Eric Scott, or any other supervisor. Various cases recognize that "[b]eing investigated by one's employer could deter a reasonable person from complaining about discrimination because investigations can be intrusive and intimidating." *Lee v. City of Syracuse*, 603 F.Supp.2d 417, 436 (N.D.N.Y. 2009), *abrogated on other grounds by Widomski v. State U. of New York (SUNY) at Orange*, 748 F.3d 471 (2d Cir. 2014); *Hough v. Texas Dep't of State Health Servs.—Meat Safety Assur. Unit*, No. 10-2206, 2012 WL 3756536, at *2 (S.D. Tex. Aug. 28, 2012) (relying on *Lee*, indicating that investigations can constitute adverse actions, and finding questions of fact on retaliation claims by two plaintiffs); *McInnis v. Alamo Community College Dist.*, 207 F.3d 276, 283 (5th Cir. 2000) (decisionmaker made no effort to validate intoxication complaint).

Likewise, in *Harden v. Marion Cty. Sheriff's Dep't*, 799 F.3d 857, 863 (7th Cir. 2015), the Seventh Circuit affirmed dismissal of a Title VII retaliation claim, and in doing so, explained in detail when "sham investigations" can be grounds for pretext. The plaintiff claimed that the

Internal Affairs investigation was mere pretext for unlawful retaliation.  The Marion County Sheriff's Department, in contrast, claimed that it terminated the plaintiff because Internal Affairs found that he perpetrated a theft of an inmate's money. In *Harden*, the plaintiff advanced the theory of a "sham investigation." A sham investigation means "persons conducting the investigation fabricate, ignore, or misrepresent evidence, or the investigation is circumscribed so that it leads to the desired outcome (for instance, by deliberately failing to interview certain witnesses)." *Harden*, 799 F.3d  at 864.  A sham investigation also requires that the decision-makers also be the same individuals who harbor racial or retaliatory animus.  The Seventh Circuit further explained that faulty reasoning or mistaken judgment is not enough to prove a sham investigation.  Instead, plaintiffs need to provide evidence which would show that the decision-makers did not actually believe in the investigation or its findings; to do this, plaintiffs "must identify such weaknesses, implausibilities, inconsistencies, or contradictions" in the report "that a reasonable person could find [it] unworthy of credence."  *Harden*, 799 F.3d at 865.  Likewise, in *White*, the Fifth Circuit noted "the thorough investigation conducted by Lieutenant Connolly—which included multiple interviews and the review of video surveillance—along with the objective nature of the lieutenant's investigation greatly reduces the likelihood that the County's legitimate reason for terminating White is a pretext for an unlawful purpose." *White v. Denton Cty.*, 655 F. App'x 1021, 1026 (5th Cir. 2016).

In *Webb*, however, no such thorough investigation was conducted by Julie O'Connell. Significant among this evidence was a series of interviews conducted by O'Connell with Ryan Kaaa, a witness to the February 28, 2017 incident (as Webb was talking directly to her at the time the leg sweep occurred), who confirmed that Scott's conduct on February 28, 2017 was not

"horseplay" and was motivated by gender.[8]   Additionally, Kaaa also relayed the following to

O'Connell:

1.  Indicated that Scott had attacked Stacy while she was on light duty for an injury.  [Dkt. 40-13, at 12:09 - 12:20]

2.  Indicated that Scott attacked Holly who had bad knees. [*Id*., at 12:23 – 12:28]  Holly asked Eric Scott "repetitively to not do it or to stop it." [*Id*., at 12:29 – 12:33]

3.  Indicated that Scott did not pray on older women in the department.  Ryan referenced Ms. Claire, Ms. Judy, and Ms. Joyce as examples of older women who Scott left alone.  [*Id*., at 20:27 – 20:45]

4.  Indicated that Scott had a relationship with Casey that Ryan described as "made you sick to your stomach" and "immature." [*Id*., at 21:46 – 22:53]

5.  Indicated that Kaaa had not experienced the same "problems" with Scott with other males in the department.  [*Id*., at 40:39 – 40:45]

6.  Indicated that Scott, who is a married man, had asked Kaaa and Stacey to attend conferences that they did not need to attend.  [*Id*., at 41:55 – 42:16]

7.  Indicated that other women, including Casey and Stephanie, had received genitalia photos from Scott.  [Dkt. 40-14, at 2:07, 3:59, 4:52 - 5:05]

8.  Indicated that Scott had propositioned Kim and Stacey to have sexual intercourse with him. [*Id*., at 7:49 – 8:08]

9.  Confirmed that the February 28, 2017 incident (referred to as the "Kim incident") was a spark that showed a pattern of conduct for years.  [*Id*., at 9:40]

At her deposition, O'Connell initially testified that Ryan Kaaa confirmed that the leg-

sweep incident was "horseplay."  [Dkt. 76-2, p. 7, *ll*. 23 – 25]  But when pressed for specifics

---

[8] "He went and held her. Not, not a support hold as you would think around your elbows if you're trying to actually catch someone you think get around their body. But held her around her shoulders, which is still rather up top and proceeded to kick. I'm not talking tap, I'm talking kick her feet out from underneath her. Which time she obviously fell."  [Dkt. 40-13, at 2:45-3:03]

 "There are different jokes and stuff like that. But that was excessive so she wasn't going to do something. It would fix a complaint. Something needed to be done because it wasn't culturally."  [Dkt. 40-13, 10:21 – 10:29]

"Obviously for that instance with Kim, if she wasn't going to complain, I was, that was a bit much."  [Dkt. 40-13, 21:06 – 21:11]

regarding any details relating to the leg-sweep incident, especially the statement made by Ryan Kaaa that Eric Scott's conduct was "excessive," O'Connell, conveniently, could not remember. [Dkt. 76-2, p. 9, *ll*. 2 – 8].

Although Julie O'Connell confirmed that she had interviewed Claire Wilson, she could not recall [Dkt. 76-2, page 23, *ll*. 1-3], at her September 21, 2020 deposition, whether or not the leg-sweep incident was horseplay. Although the City has not produced a copy of the recording of Julie O'Connell's interview with Wilson,[9] Wilson indicated that, based upon her direct observations of the leg-sweep incident, that Eric Scott's conduct was improper and was not "horseplay."  Wilson, who directly observed the leg-sweep, as Webb was sitting on the corner of her desk when it occurred, even instructed Webb to report the incident.  [Dkt. 76-3]   Claire Willson also confirmed that Webb did not touch Scott's gun. [Id.]

At her deposition, O'Connell was also asked about the substance of many of the other witness's interviews that she conducted, but could not recall any details about any of these interviews.  [Dkt. 76-2, p. 18, *ll*. 18 – 22 ("don't recall" as to Stacey Smith);  p. 21, *ll*. 16 – 18 ("I don't recall specifically on Mr. O'Rear"); p. 23, *ll*. 23 – 25 ("don't know" as to Yoselin Ramirez); p. 27, *ll*. 5 – 9 ("I don't recall" as to Jose Valles); p. 40, *ll*. 9 – 11 ( "I don't recall" as to Chief Slaven)]. O'Connell did confirm that both Webb and Smith indicated that they had received inappropriate pictures from Scott, but again, O'Connell indicated that "I don't recall that" when asked about genitalia photos from Scott.  [Dkt. 76-2, p. 27 – 28, *ll*. 20 – 3]

In sum, Webb believes, and likewise the jury may infer, animus exists by the way O'Connell and Chief Lunsford ignored evidence tending to show that (1) the incident was not "horseplay;" (2) Eric Scott's conduct during the February 28, 2017 "leg-sweep" was motivated by

---

[9] And O'Connell confirmed that she did make a recording of all the witness interviews.  [Dkt. 76-2, p. 16, *ll*. 21 – 24]  The Court has, likewise, denied Webb's request to produce same on November 13, 2020.  [Dkt. 71]

gender; (3) that Officer Webb did not touch Scott's gun; and (4) that Officer Webb did not engage in any sexual relationship with Scott. Webb seeks to ask Julie O'Connell and Chief Lunsford about those "weaknesses, implausibilities, inconsistencies, or contradictions" as they relate to the investigation, especially whether Scott improperly propositioned them, sent them photos of his genitalia, or attacked them in a similar manner to the way that Webb was attacked. **In light of this evidence, there is no reason to order a polygraph examination, and there was no reason for Chief Lunsford to believe Scott's account of events and award him with a commendation for truthfulness.**[10]    A jury may infer from Julie O'Connell's and Chief Lunsford's actions in disregarding or ignoring this evidence that they were protecting Scott[11] and attempting to punish Webb for her protected activity.

### 4. During the Process of Terminating Webb, Chief Lunsford Violated Policy and his Reasons Shifted Over Time.

The City relies, primarily, upon the findings of the SOAH hearing in order to show the reasons for Webb's termination.   This is a curious strategy, because at the time that Webb was terminated from her employment, the SOAH had not issued any findings.   Therefore, the SOAH findings are not the best evidence of the reasons why Chief Lunsford terminated Webb.   Chief Lunsford's May 3, 2017 termination letter, written contemporaneously at the time of Webb's termination, is the best of the City's alleged legitimate reasons, although those reasons, as argued *supra*, are not clearly stated on the termination correspondence.  [Dkt. 23-6]

---

[10] In April 28, 2017 correspondence, Chief Lunsford indicates:  "You [referring to Scott] are, to be commended for your truthfulness and forthrightness during this investigation.  Even under very trying circumstances, you admitted your actions and are already taking positive steps to make life adjustments."  [Dkt. 40-10]

[11] In the April 28, 2017 disciplinary action correspondence of Scott, the correspondence indicates that Scott was demoted to the rank of senior police officer and placed under probation for one year.  [Dkt. 40-10]  However, Scott's personnel action forms indicate that he was promoted back to the rank of sergeant on August 28, 2017, still within the alleged probationary period which started on May 1, 2017 and ended on May 1, 2018.  [Dkt. 40-11]  Webb is unable to see how an officer who allegedly committed wrongdoing should be allowed to promote back to a sergeant still within his probationary period.  Also, Webb's F-5 report, indicating that she was "dishonorably discharged," was submitted by Eric Scott to TCOLE. [Dkt. 40-8]; [Dkt. 40-1, at 02:45:30]

The City focuses upon the SOAH findings, but Chief Lunsford's termination letter is a violation of City Policy, especially Directive 2.4, which requires the Chief of Police to notify the "complainant and the affected employee as to the final deposition of the complaint at the conclusion of the investigation." [Dkt. 40-16, Directive 2.4.6] The final deposition determinations are listed under Directive 2.4.5, and provide such determinations as "sustained" or "exonerated." Because Chief Lunsford did not specially delineate the policy violations that were determined to be "sustained," the City failed to provide notice to Webb as to what she needed to appeal.

Furthermore, the lack of clear policy violations allowed the City to shift the reasons for Webb's termination, especially when comparing Chief Lunsford's May 3, 2017 termination letter and the findings of the ALJ in the SOAH proceeding. [Dkt. 23-12, findings 14, 15, 27] **For example,** the alleged failure of Webb to turn over the emails is not referenced in the Chief's May 3, 2017 termination correspondence. [Dkt. 23-6] If an order had been given for Webb to turn over the emails, then Chief Lunsford should have "sustained" that policy violation as required under the rules and delineated same in his termination correspondence.[12] **In another example,** the City claimed that Webb was insubordinate for failure to sign the Chief's April 12, 2017 order to submit to a polygraph. [City's MSJ, page 7] If the Chief was, in fact, investigating this policy violation, then he would be required to identify "failure to sign April 12, 2017 order" as "sustained." **Finally,** in a final example, Chief Lunsford testified that Webb was untruthful when she claimed that she did not touch Scott's gun, however, no such allegation was addressed in the termination

---

[12] And, likewise, Chief Lunsford testified that during Webb's deposition, that Webb testified under oath that she had messages or pictures. [Dkt. 76-1, page 8, ll. 1 – 7] However, what Webb testified at her deposition, which occurred after her termination, is irrelevant to the City's legitimate reasons for terminating her, as contained in Chief Lunsford's termination correspondence. [Dkt.40-7]

correspondence. [Dkt. 76-1, p. 14 – 15, *ll*. 24 – 2][13]   These specific acts, which the City claimed before the ALJ, was not addressed in the Chief's May 3, 2017 termination correspondence. [Dkt.40-7]

The Chief's termination correspondence further indicates that statements related to Eric Scott "were substantially different that those made by Sgt. Scott."  [Dkt. 23-6] Chief Lunsford does not provide Webb with any indication about what those statements are, but yet concludes that "it was apparent one of you had not been truthful during this investigation."  [*Id*.]   This is also a violation of Directive 2.4.1 [Dkt. 40-16, Section E] which requires that all complaints be documented in writing.   Directive 2.4.1 is likely codification of Section 614.023 of the Tex. Gov't. Code which prohibits disciplinary actions unless a copy of the signed complaint is given to the officer. *See Treadway v. Holder*, 309 S.W.3d 780 (Tex.App.—Austin 2010, pet. denied (extending 614.023 to internal complaints).  As recently noted by the Texas Supreme Court in *Colorado City. v. Staff*, 510 S.W.3d 435, 446–47 (Tex. 2017):

> Removal based on an allegation of misconduct naturally carries more significant consequences than dismissal at will, and the procedural safeguards provided in Chapter 614, Subchapter B advance two significant objectives: (1) ameliorating the risk that disciplinary action might be based on frivolous complaints and (2) helping to ensure an affected employee has sufficient notice of the charges to defend against the allegations. Providing notice affords the employee an opportunity to address the matter but does not preclude the employer from terminating employment so long as the "complaint" has been investigated and "there is evidence to prove the allegation of misconduct."

Here, at the time of termination, Webb did not know that she was facing misconduct relating to the emails and the failure to sign the polygraph order.   She also did not have a copy of the statements made by Scott, statements that Chief Lunsford found to be truthful (independent of the polygraph examination), which would have prepared her for the polygraph examination. Webb

---

[13] And confirmed by Claire Wilson that Webb did not touch Scott's Gun.  [Dkt. 76-3]

still does not have a copy of Scott's statements, although O'Connell confirmed the existence of same at her deposition.

### 5. Chief Lunsford's Rejection of Webb's April 13, 2017 Rebuttal.

The Huntsville Police Department, through Directive 2.4, also provides that Webb has "the right to respond to the allegations." [Dkt. 40-16]  In fact, the right to respond to allegations is a paramount right given to public employees as explained in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 547 (1985).   *Loudermill* requires, like Directive 2.4 codifies, that all officers shall be given notice and an opportunity to respond before being terminated. *See Loudermill*, 470 U.S. at 547.

On April 13, 2017, Webb wrote a long memorandum to Chief Lunsford outlining important events Webb believed the Chief Lunsford should consider in investigating Webb's March 3, 2017 complaint of sexual assault by Scott. [Dkt. 40-4]  For one, Webb indicated that her husband, Jared Webb, had attended a 2014 meeting with Assistant Chief Slaven where the sexually explicit pictures, comments, and witnessed assault from Scott were first brought to the attention of the Department.  [*Id.*]  Webb also explained how she had obtained an attorney and she did not refuse to meet with O'Connell on March 22 or March 23, 2017, but instead requested time to hold off on the meeting until her attorney could advise her.  [*Id.*]  Webb also explained that she invoked her right to have her attorney present during the April 12, 2017 polygraph order.  [*Id.*]  Finally, Webb indicated that O'Connell "was provided with names of women that had also had issued or involvement with Sergeant Scott…" [*Id.*]

Instead of responding, or even attempting to acknowledge any of what Webb had explained, Chief Lunsford callously dismissed Webb's April 13, 2017 memo.   Chief Lunsford wrote: "I have received and reviewed what you have submitted entitled 'rebuttal.' It is so factually incorrect that I will not waste the time addressing or correcting what are serious mistakes or

glaringly false statements." [Dkt. 40-5][14] There is no indication, before dismissing Webb's memorandum, that Chief Lunsford spoke with, for example, Assistant Chief Slaven to verify Jared's meeting with him in 2014, or Julie O'Connell to determine whether she had talked to the other women identified by Webb. This is clear evidence of animus.

### 6. Reasons for the Insubordination were False, or Unworthy of Credence.

On March 9, 2017, Webb was given a general order to participate in the investigation. [Dkt. 23-6, p. 1]  The general order does not prohibit Webb from engaging an attorney to represent her during the investigation.  In light of that general order, Officer Webb had requested that all communications go through her attorney.  [Dkt. 40-20] At no point in time did Officer Webb indicate that she was not going to participate in the investigation.  Instead, however, Chief Lunsford indicated that Webb had violated that general order, but in light of her compliance and request for communications to go through her attorney, a jury may conclude otherwise.[15]

Additionally, the City devotes a large proportion of the motion to acts of insubordination that occurred on April 12, 2017, the alleged acts of insubordination that occurred at or around the time that Chief Lunsford requested or ordered Webb to submit to the polygraph examination.  [Dkt.

---

[14] Of important consideration for the Court's analysis is the way that Chief Lunsford now views anything that Webb states as untruthful.  Webb had no prior record of insubordinate or untruthful conduct before she turned in her March 3, 2017 complaint.  In fact, Webb had absolutely no disciplinary record at all, she was an exemplary police officer.  Likewise, the City has failed to point to any evidence to support her termination that did not arise out of or was connected with the events that transpired after Webb had filed her March 3, 2017 complaint against Scott.  Obviously, the March 3, 2017 complaint had placed Webb under unusual scrutiny that she was not previously accustomed to and for which she did not expect to receive disciplinary action.

[15] Likewise, Huntsville Police Department, Directive 2.4, entitled "Complaints Against Employees," indicates that a Garranty warning will be provided to an employee who "refuses to provide a statement or answer questions may be subjected to disciplinary action."  [Dkt. 40-16, p. 4, section 2.4.3(E)]  The Garranty warning, which is attached as appendix D to the policy, clearly indicates that "[y]ou are entitled to all the rights and privileges guaranteed by the laws and the constitution of this state and the Constitution of the United States, including the right not to be compelled to incriminate yourself."  [*Id.*]  One of those rights is to be represented by counsel.  Webb has not identified any Garranty warning provided to her and Webb does not recall seeing any such document before she was terminated.

23-12, findings 22, 26] The problem with the City's analysis with regards to these alleged acts of

insubordination is that Chief Lunsford sent an email to Webb on April 14, 2017 indicating:

> More importantly, on April 12, 2017 you knowingly refused to comply with my
> express instruction that you participate in a polygraph examination, a clear act of
> insubordination.  I suspended you with pay at the time to consider the appropriate
> response to your insubordinate misconduct.  Although you could have been
> disciplined, including fired, for that act of insubordination, I have decided to give
> you another opportunity to comply with my instruction.

[Dkt. 40-5] Chief Lunsford's decision not to impose discipline for the alleged act of

insubordination occurring on April 12, 2017 was conditional upon Webb's participation in the

polygraph examination. Because Webb did participate in the polygraph examination, Chief

Lunsford should not have disciplined Webb for events that occurred on April 12, 2017.

### 7.  Polygraph Examination

Regarding the polygraph examination, the Huntsville Police Department's Directive 2.4

indicates that "polygraph examinations . . . will be used in conjunction with other investigative

techniques" and "no disciplinary action will be based solely upon the results of a polygraph

examination." [Dkt. 40-16, p. 4, section 2.4.3(F)(5)(b)] Yet, in an April 21, 2017 correspondence,

David P. Weeks indicates that based "specifically the polygraph examination report and results"

that Webb would receive discipline by being placed upon a *Brady* list, which would effectively

prohibit her ability to testify in Court. [Dkt. 40-6]  The April 21, 2017 correspondence, therefore,

shows that Kimberly did receive discipline, by being effectively prohibited from testifying in

Court, as a direct result of the failed polygraph examination.

The failed polygraph examination, however, did not simply result in the placing of Webb

on a *Brady* list, but also resulted in her termination.  Chief Lunsford's May 3, 2017 termination

correspondence [Dkt. 40-7], not the backdated version that was given to Webb after she was

terminated [Dkt. 40-9], indicated that the primary reason why Webb was terminated was due to

her inability "to file a case or testify in a court proceeding."   Later, Chief Lunsford changed this wording to indicate: "It is not suited to the Huntsville Police Department to employ a police officer who is unable to file a case or testify in a court proceeding based on documented dishonesty and this, *alone*, is a basis for your immediate separation."   [Dkt. 40-9, page 5 (emphasis added)]   Obviously, Webb's inability to file a case or testify in court was determined by David P. Weeks, the Walker County District Attorney, and the basis for Week's decision is contained within the four corners of the April 21, 2017 correspondence.   [Dkt. 40-6]   As noted above, that correspondence indicated that Weeks only considered the failed polygraph exam when making the decision to place Webb on the *Brady* list.   Therefore, there is evidence suggesting that Webb was also terminated, in addition to being placed on a *Brady* list, on the basis of a failed polygraph examination alone, all in violation of Directive 2.4.

The polygraph examination, itself, was also tainted by the fine received by the polygraph examiner, Hubbard, who was fined a penalty of $2,000 by SOAH for asking Webb inappropriate questions intending to determine whether Webb had engaged in sexual activity with Scott.   [Dkt. 40-18];[Dkt. 40-19]   Later, Webb received a correspondence from Will Durham, the Walker County, Texas Criminal District Attorney.   According to that letter, Mr. Durham viewed the conduct of the polygraph examiner as "improper" and the "final administrative decision calls into question the integrity and accuracy of this polygraph examination that was conducted on Webb and its results." [Dkt. 46-1, p. 32].   Since the results of that polygraph examination were paramount to the City's decision to terminate Webb, the conduct of the polygraph examiner calls into question the basis for that decision.   Thus, creating a fact issue on that basis.

Plaintiff, OFFICER KIMBERLY WEBB, prays the Court DENY the City's motion and order the relief requested herein.

Respectfully submitted,

**THE POERSCHKE LAW FIRM, PC**


/s/ RSP
**R. SCOTT POERSCHKE, JR.**
State Bar. No. 24067822
5111 Center Street
Houston, Texas 77007
Phone 713.974.1600
Fax 713.621.2106
scott@rsplegal.com

**ATTORNEY FOR THE PLAINTIFF,
KIMBERLY WEBB**


## <u>CERTIFICATE OF SERVICE</u>

I, R. Scott Poerschke, Jr. certify that a true copy of the above was served on each attorney of record or party on February 8, 2021.

William Helfand                                    ***Via email Bill.Helfand@lewisbrisbois.com***
Attorney for the City of Huntsville


/s/ RSP
**R. SCOTT POERSCHKE, JR.**