1    A.    ==There were several -- again, several==
2    ==incidents.  One had to do with the alleged text messages==
3    ==that she had received.  I recall that during her==
4    ==deposition, which I was present for, she testified under==
5    ==oath that she had those messages or pictures and that==
6    ==she had chosen not to turn them over to the City during==
7    ==the investigation.==
8          So another form of dishonesty, we were
9    investigating the horseplay incident that was caught on
10   surveillance video.  As we were reviewing that, there
11   was an incident in which Ms. Webb reached over and
12   touched another officer's side arm, appeared to be
13   trying to release the magazine from his side arm.  She
14   was questioned about that.  She adamantly denied that
15   even though there was video evidence of that.
16        Q.    And so did the horseplay incident, did you
17   review -- did you interview any witnesses on your own?
18        A.    No.
19        Q.    And all of the witnesses, those would have
20   been reviewed -- those were interviewed by
21   Ms. O'Connell; is that correct?
22        A.    That is correct.
23        Q.    And that would have been the 15 witnesses with
24   regards to the horseplay incident; is that right?
25        A.    Ms. O'Connell did the interviewing --

1    Q.   Now, anything else to indicate that Ms. Webb
2  was untruthful in the exchange of the sexually-related
3  material?
4    A.   Yes.
5    Q.   What is that, sir?
6    A.   Independently of the polygraph examination,
7  you have the -- you have the testimony of both
8  employees.  They both -- they both claim something
9  different.  Both claims cannot be true.  Therefore, we
10 investigate it.  Part of the other employee's confession
11 to his part and her denial of her part is also
12 independently a verification of her untruthfulness.
13   Q.   In terms of -- now, the testimony of both
14 employees, you're talking about the testimony of Eric
15 Scott; is that correct?
16   A.   Eric Scott and Kimberly Webb.
17   Q.   Therefore, you determined that the
18 testimony -- the testimony provided by Kimberly Webb
19 relating to the exchange of sexually-related material
20 was dishonest; is that right?
21   A.   Yes.
22   Q.   And the same testimony by Eric Scott of the
23 exchange of sexually-related material was found to be
24 honest; is that correct?
25   A.   Yes.

1       Q.   Now, with regards to the horseplay incident,
2   you determined that that was in reference to the
3   February 24th incident; is that correct?
4       A.   I don't recall the exact date, but it was --
5   it was in late February.
6       Q.   Okay.  And you determined that based upon the
7   evidence that -- that horseplay had been committed by
8   Eric Scott towards Kimberly Webb; is that correct?
9       A.   Yes.
10      Q.   Now, you -- you had -- you had indicated that
11  Ms. Webb was untruthful or dishonest in her statements
12  regarding the horseplay incident with Eric Scott,
13  correct?
14      A.   Part of that, yes.  Part of the incident.
15      Q.   Okay.  Then what -- what untruthful statements
16  did Ms. Webb indicate to you that you found to be
17  untruthful?
18      A.   To be clear, she didn't indicate it
19  specifically to me.  It was to Ms. O'Connell throughout
20  the investigation relayed to me.  It was (inaudible)
21  touching his gun and whether or not she tried to touch
22  his gun or magazine from his side arm, that sort of
23  thing.
24      Q.   Okay.  And you believe that Ms. Webb was
25  untruthful in her statement that indicated that she had

1    not touched Eric Scott's gun; is that correct?
2         A.   As evidenced by videotape, yes.
3         Q.   With regards to the horseplay incident, did
4    you ever indicate that -- or did you ever understand
5    that Ms. Webb had made a complaint against Eric Scott
6    that that incident was motivated by gender?
7              MR. HELFAND:  I'm sorry.  Ask that
8    question again before the chief answers.  Court
9    Reporter, can you read that back, please?
10             (The previous question was read back.)
11             MR. HELFAND:  Okay.  You asked him two
12   questions.  Did he ever indicate it or did he ever come
13   to the conclusion.  Which one do you want him to answer?
14             MR. POERSCHKE:  Let me rephrase the
15   question.  Thank you, Bill, for correcting that.
16        Q.   (By Mr. Poerschke)  Did Ms. Webb ever
17   indicate that she believed the horseplay incident was
18   motivated by gender?
19        A.   At some point during the investigation, yes.
20        Q.   And what did the investigation determine with
21   regards to that complaint with regards to gender?  And
22   let me just rephrase the question real quick.  What did
23   the investigation determine with regards to the gender
24   complaint?
25        A.   The horseplay incident was not related to

1   But again, Scott, I know you're going to have some
2   response, because you never seem to let somebody else
3   have the last word.  You always have an excuse for
4   everything you've done and not done.  So go ahead and do
5   it, and if you have more questions, just go ahead and
6   ask them.
7           MR. POERSCHKE:  Thanks, Bill.  I
8   appreciate it.  Appreciate your mentoring.
9       Q.  (By Mr. Poerschke)  Now, with regards to
10  the -- Ms. O'Connell's investigation did, in fact,
11  determine that the conduct of the leg sweep was
12  horseplay; is that correct?
13      A.  Yes, that is correct.
14      Q.  Okay.  And then, you agree with that
15  determination; is that right?
16      A.  Yes.
17      Q.  Now, in agreeing with that determination,
18  you've also made the decision that the leg sweep was not
19  motivated by gender; is that correct?
20          MR. HELFAND:  Are you asking if he made
21  that determination or if somebody else did?
22          MR. POERSCHKE:  No, that he did.
23      A.  Yes, correct.
24      Q.  (By Mr. Poerschke)  And in doing so, you then
25  relied upon Ms. O'Connell's investigation; is that